# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DANA STENHOLTZ**
          **Plaintiff,**

    **v.**                            **Case No. 20-C-1254**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
          **Defendant.**

---

## DECISION AND ORDER

Plaintiff Dana Stenholtz applied for social security disability benefits, alleging that she could not work due to a variety of impairments, including bipolar disorder, fibromyalgia, and obesity. An Administrative Law Judge ("ALJ") concluded that, while these impairments were severe, plaintiff remained capable of a range of sedentary, unskilled work.

In this action for judicial review, plaintiff argues that, in evaluating her residual functional capacity ("RFC") for full-time work, the ALJ failed to account for evidence of her variable functioning; in evaluating her statements regarding her symptoms and limitations, the ALJ cherry picked evidence supporting his conclusion while ignoring evidence detracting from it; and in evaluating the opinions of her treating providers, the ALJ erroneously found those opinions unsupported by and inconsistent with other evidence of record.

The problem with plaintiff's arguments is that they essentially ask the court to re-weigh the evidence and replace the ALJ's judgment with its own. That is not the purpose of judicial review. See Gedatus v. Saul, 994 F.3d 893, 900 (7th Cir. 2021) ("We will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our

judgment for the ALJ's determination so long as substantial evidence supports it."); Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021) ("Substantial evidence is not a high threshold: it means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quote marks omitted); L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th Cir. 2019) ("Where substantial evidence supports the ALJ's disability determination, we must affirm the decision even if reasonable minds could differ concerning whether [the claimant] is disabled.") (internal quote marks omitted); see also Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020) ("We will uphold the ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the ALJ's conclusion.") (internal citations, quote marks, and alterations omitted).

While it would be error for an ALJ to select and discuss only the evidence supporting his conclusion, he need not address every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability. Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021); see also Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. But an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion.") (citations omitted). In the present case, the ALJ produced a 27-page, single-spaced decision, in which he reviewed the evidence at length. Given the size of the record, which spans 2555 pages, it is hardly surprising that plaintiff is able to identify some evidence supporting her claim the ALJ did not mention. But this is not a case where the ALJ simply ignored all of the favorable evidence; he cited some of that evidence in adopting a highly restrictive RFC. See Gedatus, 994 F.3d at 901 ("[T]rue, the

2

record contains evidence that could be construed as favorable to Gedatus. But the ALJ noted some of that evidence and sided with her to a degree by determining she had severe impairments and needed some limitations on even 'light' duties. This is not a case where an ALJ ignored evidence contrary to his conclusion."). That a different ALJ could have gone further and found plaintiff disabled does not mean the decision was unsupported. See id. at 903 ("[T]he presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence."). In cases involving highly variable impairments such as bipolar disorder and fibromyalgia, "[a]lmost any conclusion an ALJ reaches . . . may be inconsistent with some evidence in the record and consistent with other evidence. This is where the substantial-evidence standard of review matters." Kolar v. Berryhill, 695 Fed. Appx. 161, 162 (7th Cir. 2017). Applying this deferential standard, I affirm the ALJ's decision.

## I. FACTS AND BACKGROUND

### A. Summary of the Case

In the decision under review, the ALJ adjudicated two consolidated applications for disability benefits, one filed in 2017 and the other in 2018. The record documents two previous applications, which were denied by an ALJ in March 2013 and May 2015, respectively, when plaintiff resided in Minnesota. (Tr. at 84, 103, 129, 133, 1629-30.)

The medical evidence in the case is voluminous; I summarize that evidence in an appendix to this decision.[1] Plaintiff supported the 2017/2018 applications with a number of reports from treating providers: Dr. Carlos Schenck, her treating psychiatrist prior to 2016,

---

[1]Given the nature of plaintiff's arguments, I have reviewed the medical record in detail.

3

when she moved from Minnesota to Wisconsin; Linda Johnson, MACP, her counselor from 2008 to 2016; Carmen Kosicek, her treating psychiatric nurse practitioner in Wisconsin; Dr. Lauren Bremberger, her primary care physician in Wisconsin; Arriann Tauer, MS, LPC, her therapist from March 2017 to October 2018; and Debbie Wicker, her counselor beginning in the fall of 2018. Summarized, these providers endorsed significant limitations in plaintiff's work-related abilities, opining that she could not maintain full-time employment due to fatigue, pain, and diminished concentration. The record indicates that, while plaintiff graduated from college (Tr. at 45, 1631), her work record was limited, consisting primarily of stints as an instructor at Crown College from 2006 to 2007 and again in 2010, and part-time employment as a member service representative/receptionist at the YMCA from late 2016 to January 2018. (Tr. at 45, 53, 73-74, 267-70.)

## B. Plaintiff's Applications and Agency Decisions

Plaintiff filed the first of the two applications at issue on March 24, 2017, alleging disability beginning on that date (Tr. at 255, 276), based on bipolar disorder, anxiety, PTSD, fibromyalgia, and type 2 diabetes (Tr. at 281). Plaintiff indicated that she stood 5'9" tall and weighed 386 pounds (Tr. at 281) and reported working part-time at the YMCA in member services since 2016 (Tr. at 282).

In a function report, plaintiff indicated she was in constant pain and often depressed and/or anxious. (Tr. at 293.) She reported doing very little around the house (Tr. at 294-96), with hobbies of reading, playing computer games, and watching Netflix (Tr. at 297). She attended church once per week and visited her brother twice a month. (Tr. at 297.) She wrote that she could not do anything physical without pain (Tr. at 298), nor could she could handle stress or changes in routine (Tr. at 299).

4

In a physical activities addendum, plaintiff reported that she could continuously sit for ½ hour, stand for five minutes and walk for five minutes, and in a day sit "most of the hours," stand "no hours" and walk "no hours." (Tr. at 301.) Her doctor had limited lifting to 10 pounds. Plaintiff wrote that she had quit or been fired from most of her jobs because she would "burn out" and could not "keep up the hours or the work or [would] miss so much that they let [her] go." (Tr. at 301.)

The agency denied the application initially in August 2017 (Tr. at 143, 161), based on the reviews of Esther Lefevre, Ph.D., who found plaintiff mildly to moderately limited in mental functioning (Tr. at 135, 140), and Mina Khorshidi, M.D., who found plaintiff capable of lifting 20 pounds occasionally and 10 pounds frequently, standing/walking two hours in an eight-hour day, and sitting six hours in an eight-hour day (Tr. at 137).

Plaintiff requested reconsideration (Tr. at 172), indicating that she had decreased her work schedule since April 2017, reducing from 20 hours per week to three-five after taking a leave of absence (Tr. at 318). She reported that, when she did not have an appointment or work, she went back and forth from laying in bed to watching Netflix, all day long. She had no energy or desire to do anything. (Tr. at 318.)

In November 2017, the agency maintained the denial (Tr. at 159, 176), based on the reviews of Stephen Kleinman, M.D. (Tr. at 152, 156-57) and George Walcott, M.D. (Tr. at 153-54), who agreed with the previous assessments. Plaintiff requested a hearing (Tr. at 188), and on March 20, 2018, she appeared with counsel before an ALJ. (Tr. at 41-81.) On May 15, 2018, the ALJ issued an unfavorable decision (Tr. at 13-34), and on July 10, 2018, the Appeals Council denied administrative review (Tr. at 1, 1525). Plaintiff sought judicial review (Tr. at 1531), and on July 30, 2019, the district court remanded for further proceedings (Tr. at 1539-

5

61).

Meanwhile, plaintiff had filed a new application for benefits on August 2, 2018, alleging disability as of that date. (Tr. at 1564, 1754.) In a function report accompanying that filing, plaintiff indicated that she could not go out in public, found it painful to sit or stand for too long, and could not concentrate or remember directions. She also experienced crying spells and panic attacks. (Tr. at 1769.) In a physical activities addendum, plaintiff reported that she could continuously sit for ½ hour, stand for 10 minutes and walk for 10 minutes, and in a day sit six hours, stand one hour and walk ½ hour. (Tr. at 1777.) She wrote that she had quit or been let go from past jobs due to inability to work every day she was scheduled or calling in sick or going home because of pain or panic attacks. (Tr. at 1777.)

The agency denied the new application at the initial level (Tr. at 1566), based on the review of Catherine Bard, Psy.D., who found mild to moderate mental limitations (Tr. at 1576, 1583-85), such that plaintiff remained capable of the basic mental demands of unskilled work on a sustained basis (Tr. at 1579, 1585), and Mina Khorshidi, who found plaintiff capable of sedentary work (Tr. at 1581-83). Plaintiff sought reconsideration, but the agency maintained the denial (Tr. at 1589), based on the reviews of Pat Chan, M.D., who found plaintiff capable of sedentary work with no concentrated exposure to dust or fumes (Tr. at 1602-04), and Jason Kocina, Psy.D., who found moderate mental limitations (Tr. at 1600, 1604-06). In his mental RFC assessment, Dr. Kocina opined that plaintiff was able to recall and carry out one to three step instructions, but would have difficulty with more complex instructions (Tr. at 1604); would generally be able to focus to complete tasks of one to three steps, but would have increasing difficulty with more complex tasks (Tr. at 1605); would do best in jobs that do not require frequent public contact and would not be expected to have difficulty getting along with

6

coworkers, but would likely have occasional minor problems reacting appropriately to criticism from supervisors (Tr. at 1605-06); and would do best in a job that does not require changing tasks from day to day, but rather has a fairly regular set of duties and expectations (Tr. at 1606).

On September 16, 2019, the Appeals Council vacated the ALJ's decision on the 2017 application and remanded for further proceedings consistent with the district court's order. (Tr. at 1564.) The Council also directed the ALJ to consolidate the 2017 and 2018 applications and issue a new decision on the consolidated claims. (Tr. at 1564.)

## C. Hearing on Remand

On December 11, 2019, plaintiff appeared with counsel for her hearing on remand. (Tr. at 1494-95.) Plaintiff testified that she had not worked since January 2018. (Tr. at 1505.) Nor had she looked for a job, indicating that the idea of working caused a panic attack. (Tr. at 1505-06.) She further alleged frequent migraine headaches starting in April 2019, for which she took medication. For her mental health, she saw a psychiatric nurse practitioner and a therapist. (Tr. at 1506.) The therapist saw her at no charge because she could not find anyone who took her insurance. She had been seeing the therapist, Debbie Wicker, weekly since November 2018. (Tr. at 1507.) Wicker listed her qualifications as "CCC, MED, SOC"; plaintiff's counsel did not know what those letters stood for. (Tr. at 1507.) Counsel further stated that Wicker provided no treatment notes in response to his request, just her assessment and a letter. Plaintiff explained that they met weekly in a private room in a library close to plaintiff's home, and Wicker "really doesn't keep notes." (Tr. at 1503.)

On reviewing the medical records, the ALJ noted that plaintiff appeared to gain benefit regarding her pain and physical limitations from aquatic therapy treatments. Plaintiff testified

7

that "it helped while I was doing it, but they didn't recommend me getting more treatment. I don't know why." (Tr. at 1508.) The ALJ asked why, if it helped, plaintiff did not try to get more, and plaintiff responded: "It was a long drive, and it was a couple times a week. And it was very hard to get there. And I felt like the effort of going wasn't worth the benefit of doing it. It wasn't really like the long-term effect. By the time I got home, it was all worn off." (Tr. at 1508.)

Asked if she took medications for her fibromyalgia, plaintiff mentioned just Tylenol for pain. She stated that the fibromyalgia medications prescribed by her doctors in the past either did not work or she was allergic to them. (Tr. at 1509.) She testified that she stood 5'9" and weighed 369 pounds at that time. (Tr. at 1508.)

The ALJ asked if plaintiff had ever been hospitalized for her mental health, and she responded not since 1996. (Tr. at 1510.) Asked why she had not tried in-patient treatment (Tr. at 1510), plaintiff responded that she called a hospital one time and asked if she could come in, and they would not let her "unless [she'd] already harmed [herself]." (Tr. at 1511.) She had not asked again because she thought that is what the answer would be. (Tr. at 1511.)

Plaintiff testified that she lived with her parents. (Tr. at 1511.) Asked what she did with her time, plaintiff responded that she played games and looked at Facebook on her phone, visited her brother and went to church weekly, and watched TV. (Tr. at 1512, 1515.) She testified that she lacked the focus and concentration to read books. (Tr. at 1513.) She did not do much around the house, spending much of the day in bed or sitting in a La-Z-Boy chair; she lacked motivation to do more. She had lived with her parents for 10 years. (Tr. at 1514.)

Plaintiff testified that, since the prior hearing in May 2018, she was not really manic anymore. She might have moments where she felt really amazing, but they quickly passed. She mostly felt depressed and anxious: "Can't function; frozen; anxiety." (Tr. at 1516.) The

8

depression and anxiety had gotten worse. (Tr. at 1516.) At the previous hearing, plaintiff noted about four "bad days" per month, where she did not tend to personal care, did not leave the house, and isolated in her room; that had since doubled. (Tr. at 1516-17.) Her physical pain from neuropathy and fibromyalgia had gotten somewhat worse. (Tr. at 1517.)

Plaintiff testified that her last job was at the YMCA, in member services, from the end of 2016 to January 2018. This was a sit-down job, four to five hours per week. (Tr. at 1517.) She quit that job because it was took taxing for her brain. She indicated that she was making mistakes and forgetting how to do the work. For instance, the job required entering codes into a computer, and she was forgetting how to do that, also messing up on the drawer totals at the end of her shift. (Tr. at 1518.)

Plaintiff testified that her migraines started in April 2019, and that she experienced at least two per week. (Tr. at 1518.) During a headache episode, she became nauseous and light-sensitive, and had to lay down in a dark room for about three hours. (Tr. at 1519.) Her medication decreased the length but did not change the intensity or frequency. (Tr. at 1519-20.) She received medications for migraines from her psychiatric provider and had recently seen a neurologist. (Tr. at 1520.)

The ALJ elected not to take additional testimony from a vocational expert ("VE") at this hearing. (Tr. at 1521.) At the previous hearing on the 2017 application, a VE testified that a person limited to sedentary work; simple, routine, and repetitive tasks with no fast-paced work; only simple work-related decisions; no more than occasional workplace changes; and only occasional interaction with the public, coworkers and supervisors, could not do plaintiff's past jobs but could work as a sorter and document preparer. (Tr. at 76-77.) The VE further testified that employers typically permit one absence per month, two 15-minute breaks on either side

9

of a 30-minute lunch period, and 10% off task behavior; exceeding these tolerances would preclude competitive work.  (Tr. at 78-79.)  A need to lie down during the day to elevate the legs above waist level at least two hours during an eight-hour workday, or for an unusual level of supervision (in a simple, routine job), would also preclude work.   (Tr. at 79-80.)

## D.    ALJ's Decision on Remand

On February 25, 2020, the ALJ issued an unfavorable decision on the consolidated applications.  (Tr. at 1455.)  Following the five-step evaluation process, the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity ("SGA") since March 24, 2017, the initial application date.  While she had worked at the YMCA after that date, this work did not rise to the level of SGA.  (Tr. at 1460.)

At step two, the ALJ determined that plaintiff had the severe impairments of fibromyalgia, morbid obesity, bipolar disorder, depression, PTSD, and anxiety.  (Tr. at 1460.) The record referenced a variety of other impairments, e.g., diabetes, asthma, right foot/ankle irregularities, and headaches, but the ALJ found that these impairments caused no more than minimal limitations on plaintiff's ability to perform basic work activities or (in the case of her migraines) did not satisfy the 12-month durational requirement.  (Tr. at 1461, 1463.)  However, the ALJ acknowledged that in determining RFC he had to considered the limitations from all medically determinable impairments, severe and non-severe.  (Tr. at 1464.)

At step three, the ALJ determined that none of plaintiff's impairments met or equaled a Listing.  There are no specific Listings for fibromyalgia or obesity, although these impairments may in conjunction with another impairment medically equal a Listing.  Here, the ALJ found that the evidence did not establish that plaintiff's obesity or fibromyalgia medically equaled a Listing. (Tr. at 1464.)

10

The ALJ evaluated plaintiff's mental impairments under Listings 12.04 (depressive disorders), 12.06 (anxiety disorders), and 12.15 (trauma and stress related disorders). Those Listings are satisfied if the claimant has one "extreme" or two "marked" limitations under the "paragraph B" criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 1464.)

The ALJ found mild limitation in understanding, remembering, or applying information, noting that while plaintiff reported problems with completing tasks, memory, understanding, and following instructions, the treatment records showed that she had an intact memory, average fund of knowledge, average intelligence, coherent thought processes, and relevant thought content. (Tr. at 1464, citing Tr. at 724.) Other records confirmed that she was oriented, with logical thought content, and intact memory. (Tr. at 1464, citing 935, 940, 944.) The ALJ acknowledged that the records documented abnormalities at times (e.g., guarded and easily distracted attitude, fluctuating level of awareness, and depressed and tearful affect), but she still had full orientation, the ability to follow commands, the ability to recall a time-line of events, logical and organized thought processes, and no hallucinations or delusions. (Tr. at 1464-65, citing Tr. at 2248-49.) Plaintiff also engaged in activities requiring the ability to understand, remember, and apply information, such as playing games like Scrabble on her phone, using Facebook, and watching television. (Tr. at 1465.)

The ALJ found a moderate limitation in interacting with others. Plaintiff reported symptoms that could affect this area of functioning, including a depressed mood, anger outbursts, irritability, and panic attacks. (Tr. at 1465, citing Tr. at 723.) She also complained of out-of-control anxiety regarding every day tasks, catastrophic thinking, ruminating thoughts,

11

crying spells, limiting life participation, sleeping and hiding in her bedroom, and being hypercritical of herself. (Tr. at 1465, citing Tr. at 2201.) However, the record indicated that plaintiff had some ability to interact with others in a positive and appropriate manner. For instance, the treatment records revealed reasonably good mental functioning during a number of examinations, such as a friendly, cooperative and open attitude, good eye contact, and an appropriate affect. (Tr. at 1465, citing Tr. at 614.) Other records showed that she had an anxious mood and congruent affect but a cooperative attitude, normal speech, and coherent thought processes. (Tr. at 1465, citing Tr. at 724.) She did exhibit increased abnormalities at times, such as limited eye contact, a depressed mood and tearful affect, and speech that was slow, soft and monotone. (Tr. at 1465, citing Tr. at 2448-49.) Yet other treatment notes around that time continued to show cooperative behavior, no distress, good grooming, and normal mood and affect. (Tr. at 1465, citing Tr. at 2447.) The ALJ further noted that while plaintiff testified that she did not typically leave home without family, she had been able to work at the YMCA as a customer service representative until she elected to stop in January 2018. Although plaintiff indicated that she experienced social withdrawal and isolation, she also confirmed that she was able to attend church on a weekly basis and go to her brother's house. (Tr. at 1465, citing Tr. at 297.) And even though she reported that she tried to avoid authority figures, she acknowledged that she got along "fine" with them and complied with their directions. She also indicated that she had never been fired or laid off from a job because of problems getting along with coworkers. (Tr. at 1465, citing Tr. at 299, 1775.)

The ALJ found a moderate limitation in concentrating, persisting, or maintaining pace. Plaintiff reported problems with concentration and completing tasks, but the record indicated that she had some ability to pay attention and bring tasks to completion. The treatment notes

revealed mostly good function (with some exceptions) including intact and adequate concentration, the ability to follow commands, and a good attention span. (Tr. at 1465, citing Tr. at 614.) Although an examination in the fall of 2018 documented abnormalities such as fluctuating concentration, she still had full orientation, the ability to follow commands, and logical and organized thought processes. (Tr. at 1465, citing Tr. at 2448-49.) By October 2019, she had some abnormalities (including disheveled appearance) but an intact attention span and concentration, orientation within normal limits, intact abstract reasoning, and the ability to complete simple computations. (Tr. at 1465, citing Tr. at 1871.) Her testimony also suggested that she had some capacity to sustain focus and concentration because she was able to use Facebook, play phone games like Scrabble, watch television, and attend church. (Tr. at 1465-66.)

Finally, the ALJ found moderate limitation in adapting or managing oneself. Plaintiff reported problems handling stress and changes in routine. (Tr. at 1466, citing Tr. at 298.) She also complained of a depressed mood, feelings of helplessness or hopelessness, feelings of anxiety, anger outbursts, decreased energy, irritability, panic attacks, passive suicidal ideation, a history of manic episodes, trauma flashes, and low self-esteem. (Tr. at 1466, citing Tr. at 723, 728.) Yet the record indicated that she had some capacity to adapt to change and take care of herself. The treatment records showed that she was well-groomed with a cooperative and friendly attitude, appropriate affect, intact judgment, good insight, and no suicidal thoughts. (Tr. at 1466, citing Tr. at 625.) Although she appeared disheveled with an anxious mood and congruent affect in March 2017, she still exhibited a cooperative attitude, intact judgment, fair insight, and no hallucinations or delusions. (Tr. at 1466, citing Tr. at 724.) She also indicated that psychiatric medications and therapy were helpful for her mental conditions at times. (Tr.

13

at 1466, citing Tr. at 602-713.) When she had increased symptoms, her medication regimen was adjusted to afford better control of her impairments. (Tr. at 1466, citing Tr. at 2443-97.) Despite the severity of her reported symptoms, she did not receive any inpatient care during the relevant period. She testified that she called one time in the past about inpatient care and was told that she would not be admitted unless she had already tried to hurt herself. She explained that she thought she would get that same response again. Assuming that a medical worker would tell a person that they had to hurt themselves to be admitted, the ALJ noted tat the evidence revealed plaintiff's symptoms had not gotten to the point where she sought admission or her parents tried to have her admitted. (Tr. at 1466.)

Because plaintiff's mental impairments did not cause two marked or one extreme limitation, the paragraph B criteria were not satisfied. The ALJ acknowledged that the paragraph B criteria are not an RFC assessment but are used at steps two and three of the evaluation process. The mental RFC used at steps four and five require a more detailed assessment of mental functioning, and the RFC in the ALJ's decision reflected the degree of limitation he found in the paragraph B mental function analysis. (Tr. at 1466.)

Prior to step four, the ALJ found that plaintiff had the RFC to perform sedentary work, except that she was limited to simple, routine and repetitive tasks, no fast-paced work, only simple work-related decisions, occasional workplace changes, and occasional interaction with the public and supervisors. (Tr. at 1466.) In making this finding, the ALJ considered plaintiff's statements regarding her symptoms and the medical opinion evidence. (Tr. at 1467.)

In considering plaintiff's symptoms, the ALJ noted the required two-step process, under which he first had to determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce her pain or other symptoms.

14

Second, once such an impairment was shown, he had to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they affected plaintiff's ability to work. For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's work-related abilities. (Tr. at 1467.)

Plaintiff primarily alleged disability due to mental impairments, fibromyalgia, obesity, and diabetes with complications. She asserted that these conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. (Tr. at 1467.) The ALJ noted that plaintiff lived with her parents. While she previously attended college, she had a very limited employment record. She worked at the YMCA part-time after the alleged onset date, but she eventually asked for a leave of absence. While she testified that she did not typically leave the house alone, she had been able to work at the YMCA as a customer service representative until she stopped in January 2018. She testified that she was unable to keep going to the job due to her health conditions. (Tr. at 1467.)

The ALJ concluded that, while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical and other evidence of record. (Tr. at 1467.) In support of this finding, the ALJ first reviewed the medical evidence.

The medical evidence showed that plaintiff had fibromyalgia, with her symptoms at times labeled as chronic pain syndrome. (Tr. at 1467, citing Tr. at 905-06, 979.) She reported numerous symptoms, including constant pain all over the body. (Tr. at 1467, citing Tr. at 798.)

15

She described the pain as burning, sharp, aching, throbbing, shooting, and tingling; asserted that prolonged activity such as sitting, standing, or walking made the pain worse; and stated that the pain negatively affected her sleep pattern. (Tr. at 1467-68, citing Tr. at 798.) She further asserted that she experienced severe fatigue and "fibro fog" where she could not think clearly and became exhausted. (Tr. at 1468, citing Tr. at 584, 990.) Examinations confirmed that she had abnormalities associated with fibromyalgia, including pain and tenderness in several areas and tender points. (Tr. at 1468, citing Tr. at 905.)

Plaintiff presented to a number of medical providers due to complaints of fibromyalgia and chronic pain. In May 2017, she saw Dr. David Tylicki, a pain and rehabilitation specialist (Tr. at 1468, citing Tr. at 900), and he recommended she take medication and attend physical therapy (Tr. at 1468, citing Tr. at 905-06). Plaintiff later reported that she did not feel Dr. Tylicki was helpful. (Tr. at 1468, citing Tr. at 480.) In July 2017, plaintiff saw Dr. Carly Skamra, a rheumatologist, with complaints of pain, and Dr. Skamra observed that plaintiff was well appearing and in no distress but positive for 18/18 tender points.[2] Dr. Skamra referred plaintiff to physiatry and deferred medication management to other providers. (Tr. at 1468, citing Tr. at 585.)

In August 2017, plaintiff attended an evaluation with Dr. Yechiel Kleen, a pain and rehabilitation specialist, due to her complaints of chronic pain. At the time, she primarily took Tylenol for pain. (Tr. at 1468, citing Tr. at 978.) On exam, Dr. Kleen made a number of

---

[2] See Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) ("The principal symptoms [of fibromyalgia] are 'pain all over,' fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.").

16

observations but did not address whether plaintiff had tender points. Dr. Kleen believed that she had chronic pain syndrome, fibromyalgia, physical de-conditioning, sleep difficulties, and morbid obesity. Dr. Kleen suggested that plaintiff's antidepressant medication be increased to help control pain, and that she attend physical therapy, complete independent water therapy, and see a pain psychologist. (Tr. at 1468, citing Tr. at 979.)

Plaintiff started physical therapy in August 2017, including aquatic therapy. At the initial visit, she described waxing and waning pain ranging from 3 to 10 on a 10-point scale. (Tr. at 1468, citing Tr. at 990.) The therapist thought that plaintiff's symptoms were due to general de-conditioning with added problems due to fibromyalgia, chronic pain, and balance deficits. (Tr. at 1468, citing Tr. at 993.) The physical therapy notes stated that while plaintiff had ongoing discomfort she usually tolerated the sessions well. (Tr. at 1468, citing Tr. at 969-1060.)

As of September 2017, the therapy records stated that plaintiff was doing well with the treatment regimen. She noted some soreness after sessions but reported improved tolerance for walking and other activities. (Tr. at 1468, citing Tr. at 1021.) She shared that she had decreased pain with daily activities and an improved mental status with regard to what she felt she was able to do at home. (Tr. at 1468, citing Tr. at 1022.) She further stated that she was "surprised how well things are going." (Tr. at 1468, quoting Tr. at 1027.)

During sessions in October 2017, plaintiff had good tolerance to the progression of endurance tasks and improved confidence in herself with regard to completing tasks. (Tr. at 1469, citing Tr. at 1035.) Plaintiff noted improved endurance with walking, standing, and completing daily tasks since the start of exercise. She had a decrease in overall pain, reporting a recent flare up with increased activities but no functional deficits because of it. She was

17

advised to continue independent strengthening in the pool two to three times per week and return to therapy if she had increased discomfort or decreased functional tolerances. She was independent with regard to her ability to participate in water exercises. (Tr. at 1469, citing Tr. at 1047.)

In October 2017, Dr. Kleen agreed that plaintiff had physical de-conditioning secondary to fibromyalgia, but she nevertheless exhibited no muscle atrophy and a normal gait. Dr. Kleen also documented that plaintiff had sleep difficulties secondary to fibromyalgia but nevertheless observed that she was alert and oriented at the visit. (Tr. at 1469, citing Tr. at 1054-55.) As of February 2018, Dr. Bremberger, plaintiff's primary care physician, documented that plaintiff's fibromyalgia was a chronic problem but stable. (Tr. at 1469, citing Tr. at 2265.) Dr. Bremberger typically treated plaintiff for other issues, such as acute illness. (Tr. at 1469, citing Tr. at 2241-77.)

The ALJ noted that at the hearing he asked plaintiff why she no longer did pool exercises, since they seemed to help with her symptoms, and plaintiff testified that Dr. Kleen had not recommended getting more treatment. She further stated that she did not participate in pool therapy because it was a long drive, hard to get there, had to be done a couple times per week, and the effort of going was not worth the benefit. She also testified that she was not taking medications for fibromyalgia because they did not work. (Tr. at 1469.)

The ALJ noted that the medical evidence also confirmed that plaintiff was obese, with a body mass index ("BMI") over 50. She underwent gastric bypass surgery in 2003, after which she lost around 200 pounds, but she later regained weight and records from the relevant time continued to document a BMI over 50. (Tr. at 1469.)

However, the physical examinations indicated that plaintiff had reasonably good function

18

despite her morbid obesity. In May 2017, she had a BMI of 54.98 but normal respiratory and cardiovascular exams, and normal muscle strength in the lower extremities. (Tr. at 1470, citing Tr. at 905.) As of August 2017, she was morbidly obese but had normal vital signs and strength, no muscle atrophy, and a gait essentially within normal limits. (Tr. at 1470, citing Tr. at 979.) Similarly, in November 2017, she was morbidly obese but in no distress with normal vital signs and normal cardiovascular and pulmonary exams. (Tr. at 1470, citing Tr. at 2251.)

As for her mental health, plaintiff was diagnosed with bipolar disorder, depression, anxiety, and PTSD. (Tr. at 1470, citing 923, 1885.) She reported various symptoms including a depressed mood, feelings of helplessness or hopelessness, feelings of anxiety, anger outbursts, decreased energy, irritability, panic attacks, passive suicidal ideation, history of manic episodes, trauma flashes, and low self-esteem. (Tr. at 1470, citing Tr. at 723, 728.) She complained of out-of-control anxiety regarding everyday tasks, catastrophic thinking, ruminating thoughts, crying spells, limiting life participation, sleeping and hiding in her bedroom, and being hypercritical of herself. (Tr. at 1470, citing Tr. at 2201.) She described herself as feeling flat, not wanting to live, and merely surviving due to the pain that contributed to depression. (Tr. at 1470, citing Tr. at 1894.) She reported a history of substance use and alcohol abuse but noted that she no longer used drugs and only occasionally drank alcohol. (Tr. at 1470, citing Tr. at 724.)

Dr. Schenck, a psychiatrist, started treating plaintiff prior to the alleged onset date. (Tr. at 1470, citing Tr. at 824.) On September 1, 2016, Dr. Schenck had his final appointment with plaintiff, as she was moving from Minnesota to Wisconsin. Dr. Schenck stated that plaintiff had bipolar disorder, PTSD, generalized anxiety disorder, and insomnia. (Tr. at 1470, citing Tr. at 923.) He documented that plaintiff had a largely normal mental status exam at that time. (Tr.

19

at 1470, citing Tr. at 925.)  Likewise, he documented fairly good functioning during previous exams, as plaintiff presented with a well-groomed appearance, logical thought content, intact memory, and focused attention span/concentration.  (Tr. at 1470, citing  Tr. at 935, 940, 944, 956.)  At the final visit, Dr. Schenck stated that plaintiff's insomnia was controlled; her PTSD, depression, and anxiety were stable; and she had mood stability with medications.  (Tr. at 1470, citing Tr. at 923.)

Thereafter, plaintiff saw a new provider, nurse practitioner Kosicek, for psychotherapy and medication management throughout the period at issue.  (Tr. at 1470, citing Tr. at 499-582, 602-713, 1809-68.)  Kosicek assessed bipolar disorder, depression, PTSD, and anxiety.  (Tr. at 1470, citing Tr. at 614.)  Kosicek monitored plaintiff's medication regimen, which included various prescriptions.  (Tr. at 1470, citing Tr. at 615.)

Although plaintiff reported ongoing mental health symptoms, she made a number of positive statements to Kosicek about her functioning and treatment.  For instance, in April 2017 plaintiff asserted that she was cooking, doing other things again, and feeling good.  (Tr. at 1470, citing Tr. at 684.)  In May 2017, plaintiff reported to Kosicek that she felt good and treatment had been helpful.  (Tr. at 1470-71, citing Tr. at 673.)  In August 2017, plaintiff stated that she was doing really well, working part-time, and house/dog sitting for her brother for two weeks.  (Tr. at 1471, citing Tr. at 639.)  In December 2017, plaintiff stated that she was loving the medication injections and things were going well.  (Tr. at 1471, citing Tr. at 617.)  The treatment records did not document significant ongoing medication side effects.  (Tr. at 1471.)

Kosicek's treatment notes also documented many examinations showing reasonably good mental function.  (Tr. at 1471, citing Tr. at 635-36, 646-47, 657-58, 669-70, 681-82, 701-02.)  For instance, Kosicek observed in December 2017 that plaintiff was well-groomed with

20

a cooperative and friendly attitude, appropriate affect, normal motor activity, steady and even gait, intact and adequate concentration, intact judgment, good insight, good attention span, and no suicidal thoughts. (Tr. at 1471, citing Tr. at 625.) In February 2018, plaintiff presented with a friendly, cooperative and open attitude, good eye contact, appropriate affect, the ability to follow commands, normal thought content, intact and adequate concentration, intact judgment, good insight, intact memory, and good attention span. (Tr. at 1471, citing Tr. at 614.) An examination in June 2018 was largely normal. (Tr. at 1471, citing Tr. at 2333-34.) In August 2018, Kosicek stated that plaintiff had a friendly and cooperative attitude, appropriate mood, normal motor activity, steady and even gait without complaints of pain, intact concentration, good insight and judgment, intact memory, good attention span, and no suicidal ideation. (Tr. at 1471, citing Tr. at 2480-81.)

The ALJ acknowledged that plaintiff had increased problems during some appointments. (Tr. at 1471, citing Tr. at 1894, 2448-49.) For instance, in October 2018, Kosicek noted a disheveled appearance, guarded and easily distracted attitude, fluctuating level of awareness, limited eye contact, depressed and tearful affect, hyperactive motor activity, uneven gait, slow monotone speech, loose thought flow, and fluctuating concentration. However, Kosicek also noted some good findings including full orientation, the ability to follow commands, logical and organized thought processes, and no hallucinations or delusions. (Tr. at 1471, citing Tr. at 2448-49.) Kosicek adjusted plaintiff's medication regimen and suggested that she try a new drug for treatment-resistant depression. (Tr. at 1471, citing Tr. at 2450.) Primary care records from Dr. Bremberger in the fall of 2018 documented plaintiff's alertness, cooperative behavior, no distress, good grooming, and normal mood and affect. (Tr. at 1471, citing Tr. at 2427.)

In January 2019, Kosicek encouraged plaintiff to seek inpatient care after she reported

21

increased symptoms including not wanting to live due to pain and depression. (Tr. at 1471, citing Tr. at 1894.) Plaintiff denied current suicidal intentions, and Kosicek again adjusted her medications. (Tr. at 1471, citing Tr. at 1897, 1900.)

By October 2019, plaintiff reported that she was happy with the medication adjustment and felt less flat, not depressed, and not too moody. She acknowledged that her symptoms could increase and consequently took her medications every day. (Tr. at 1471, citing Tr. at 1870.) Kosicek observed that plaintiff appeared disheveled with an unsteady gait, but with direct eye contact, coherent language, normal speech, and an appropriate attitude. (Tr. at 1471-72, citing Tr. at 1870-71.) Kosicek concluded that plaintiff had an intact attention span and concentration, orientation within normal limits, intact memory, intact abstract reasoning, and the ability to complete simple computations. Despite a depressed mood and flat affect, she displayed intact judgment, good insight, no psychosis, and relevant thought content. (Tr. at 1472, citing Tr. at 1871.)

The ALJ noted that plaintiff also attended therapy with Arriann Tauer, MS, LPC, after the alleged onset date. (Tr. at 1472, citing Tr. at 397-413, 723-75, 2498-2510.) In February 2018, plaintiff reported a number of symptoms, including out-of-control anxiety, catastrophic thinking, ruminating thoughts, fear, crying spells, hypercritical thoughts about herself, and feelings of dread. (Tr. at 1472, citing Tr. at 727.) Plaintiff reported that she had been going out of the house two times per week to increase her mood and improve anxiety problems. (Tr. at 1472, citing Tr. at 728.) Other progress notes from Tauer contained similar information, including plaintiff's reports of symptoms and life stressors along with summaries of their interactions at the sessions. (Tr. at 1472, citing 397-413, 723-75, 2498-2510.) Tauer's progress notes about plaintiff's mental status in the summer and fall of 2018 stated that she

22

had an anxious mood but cooperative behavior, full orientation, and logical and coherent thought processes.  (Tr. at 1472, citing Tr. at 2499-2505.)

The ALJ concluded that while plaintiff clearly suffered from physical and mental impairments, her allegations of <u>disabling</u> symptoms and limitations were not consistent with the totality of the evidence.  The medical evidence showed that she had fibromyalgia with significant symptoms, yet the physical therapy records revealed fairly good improvement with pool exercises.  While participating in physical therapy, plaintiff was able to increase her physical abilities and tolerate the exercises reasonably well.  She had improved endurance, improved abilities to complete tasks, and a decrease in overall pain with physical therapy.  (Tr. at 1472.)

The evidence also showed plaintiff was morbidly obese with a BMI over 50.  Despite this condition, she usually had physical exams with normal cardiovascular and respiratory findings, and normal strength in the extremities.  (Tr. at 1472.)

The evidence further showed that plaintiff had multiple mental impairments, with the progress notes suggesting waxing and waning of symptoms.  Although she experienced various symptoms, such as depressed mood, feelings of anxiety, and irritability, the treatment records showed that she still exhibited reasonably good mental function during examinations.  (Tr. at 1472, citing Tr. at 602-723, 723-75, 923-68.)  Among other things, the progress notes showed that she exhibited a cooperative and friendly attitude, appropriate affect, intact and adequate concentration, intact memory, average fund of knowledge, and no hallucinations or delusions.  (Tr. at 1472-73, citing Tr. at 602-713, 723-75.)  Plaintiff also reported that psychiatric medications and therapy were helpful.  (Tr at 1473, citing Tr. at 602-713.)  In sum, the mental examinations throughout the relevant period documented mostly good findings (with

23

some exceptions).  Moreover, plaintiff's activities indicated that she did not suffer from debilitating symptoms, as she was able to go shopping, attend church, visit family, go out to eat with her parents, watch TV, play games, and interact with others on Facebook.  (Tr. at 1473.)

The ALJ further noted that plaintiff did not seek inpatient treatment during the period at issue.  Plaintiff testified that she did call a hospital on one occasion to inquire, only to be told that if she needed to hurt herself to be admitted.  The ALJ found it hard to imagine that a mental health care worker would say that, but even if true plaintiff's symptoms apparently never reached the point where either she or her parents presented to a hospital seeking inpatient or other intensive care.  (Tr. at 1473.)

Turning to the opinion evidence, the ALJ noted that the agency medical consultants at the initial and reconsideration levels on the 2017 application, Drs. Khorshidi and Walcott, found that plaintiff could perform sedentary work, but occasionally lifting 20 pounds and frequently lifting 10 pounds.[3]  In the consolidated case from 2018, Dr. Khorshidi opined at the initial level at that plaintiff could perform a full range of sedentary work, and at the reconsideration level Dr. Chan opined that plaintiff could perform sedentary work with limited exposure to pulmonary irritants due to her asthma.  (Tr. at 1473.)

The ALJ gave great weight to the consultants' opinions that plaintiff could perform sedentary work.  The evidence received after the consultants offered their opinions did not show significantly greater impairments and limitations.  Although plaintiff exhibited

---

[3]Sedentary work involves lifting no more than 10 pounds and is primarily done seated, with occasional walking and standing.  20 C.F.R. § 416.967(a).  Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds, and "a good deal of walking or standing."  20 C.F.R. § 416.967(b).

24

abnormalities upon examination due to obesity (such as positive straight leg raising due to body habitus), she still displayed reasonably good function despite her BMI including full muscle strength, no dynamic weakness with ambulation, no muscle atrophy, and mostly normal cardiovascular and pulmonary examinations. (Tr. at 1473, citing Tr. at 583-88, 885-915, 969-1060.) While she also exhibited abnormalities due to fibromyalgia (such as positive tender points), the medical evidence showed that her ability to function improved with physical therapy, with an increased ability to ambulate, reduced fatigue, and lower level of pain overall while participating in aquatic exercises. (Tr. at 1473, citing Tr. at 969-1060.) The ALJ thus found the evidence as a whole consistent with the consultants' opinions that plaintiff could perform sedentary work. (Tr. at 1473-74.)

The ALJ gave little weight to Dr. Chan's opinion that plaintiff required a limitation concerning pulmonary irritants. The treatment records indicated that plaintiff's asthma, while persistent, was mild and uncomplicated (Tr. at 1474, citing Tr. at 393, 469), and the examinations typically revealed good function such as normal breath sounds, no respiratory distress, no wheezes, and no rales (Tr. at 1474, citing Tr. at 458, 1319). Plaintiff reported shortness of breath due to asthma and, notably, she was also obese and de-conditioned. (Tr. at 1474, citing Tr. at 388, 392-93.) The ALJ found that plaintiff's obesity, de-conditioning, and/or shortness of breath was reasonably accommodated by limiting her to sedentary work. (Tr. at 1474.)

The agency psychological consultant at the initial level on 2017 application, Dr. Lefevre, found no significant limitations in understanding and memory; moderate limitations of concentration, persistence, or pace; mild limitations in social interaction; and moderate limitations in adaptation. At the reconsideration level, Dr. Kleinman largely agreed with the

25

initial assessment except he found plaintiff moderately limited in the ability to interact with the general public. Specifically, he opined that plaintiff could interact with others but with minimal public contact, the ability to focus adequately on simple tasks, and the ability to adapt to simple changes. He further explained that plaintiff was moderately limited in maintaining attention and concentration for extended periods, but that she had the ability to maintain attendance and complete a normal workday and workweek without interruptions or needing more rest periods than expected. (Tr. at 1474.)

In the consolidated case from 2018, Dr. Bard opined in September 2018 that plaintiff had mental difficulties but could engage in unskilled work. On reconsideration, Dr. Kocina opined that plaintiff had moderate limitations in the paragraph B criteria, but she could recall and carry out one to three step instructions, would do best in jobs without frequent public contact, could get along with coworkers, would have only occasional minor problems reacting to criticism from supervisors, and would do best at a position with a fairly regular sets of duties and expectations. (Tr. at 1474.)

The ALJ gave great weight to the 2017 opinions finding no significant limitations in understanding, remembering, or applying information, and little weight to the more recent opinions suggesting moderate limitation in this area. (Tr. at 1474.) The ALJ noted that the evidence throughout the relevant period showed that plaintiff usually displayed intact memory, full orientation, the ability to follow commands, and the ability to recall a time-line of events. (Tr. at 1474-75, citing Tr. at 723-75, 2443-97.)

The ALJ gave great weight to the consultants' opinions that plaintiff had moderate limitations in concentration, persistence, and pace, and in adapting and managing oneself. These opinions were supported by evidence showing that plaintiff reported difficulty with

26

concentration and had abnormalities on occasion (such as fluctuating concentration), but she routinely exhibited intact and adequate concentration, the ability to follow commands, and a good attention span. (Tr. at 1475, citing Tr. at 602-713, 2443-97.) These opinions were further supported by evidence showing that plaintiff reported difficulty with handling stress and exhibited some abnormalities (such as a disheveled appearance), but she repeatedly exhibited a cooperative and friendly attitude, intact judgment, good insight, and no suicidal thoughts. (Tr. at 1475, citing Tr. at 602-713, 2443-97.)

The ALJ also gave great weight to the opinions of Drs. Kleinman, Bard, and Kocina that plaintiff was moderately limited in the ability to interact appropriately with the public. He further gave great weight to the opinions of Drs. Bard and Kocina that plaintiff was moderately limited in the ability to interact with supervisors, and great weight to the opinions of Drs. Lefevre, Kleinman, Bard and Kocina that plaintiff was not limited in the ability to interact with coworkers. (Tr. at 1475.)

The ALJ explained that the evidence supported moderate difficulties with the public and supervisors. Plaintiff reported symptoms that could affect social functioning (such as depressed mood, social isolation/withdrawal, angry outbursts, irritability, and panic attacks), but she still exhibited reasonably good function during many examinations. (Tr. at 1475, citing Tr. at 602-713, 723-75.) The treatment records revealed that plaintiff had a friendly, cooperative, and open attitude with good eye contact and an appropriate affect. (Tr. at 1475, citing Tr. at 614.) Other treatment records showed that she had an anxious mood and congruent affect but a cooperative attitude, normal speech, and coherent thought processes. (Tr. at 1475, citing Tr. at 724.) Although plaintiff indicated that she experienced social withdrawal, she confirmed that she was able to attend church, work with the public at the YMCA, meet a counselor at the

27

library to talk, use Facebook, and go shopping occasionally. Plaintiff reported that she got along fine with authority figures, although she tried to avoid them, and further indicated that she had never been fired from a job because of problems getting along with coworkers. The evidence since these opinions did not establish significantly greater limitations regarding social interactions. (Tr. at 1475.)

Given her moderate mental difficulties, the RFC limited plaintiff to simple, routine and repetitive tasks, no fast-paced work, only simple work-related decisions, occasional workplace changes, and occasional interaction with the public and supervisors. The last of these limitations addressed plaintiff's problems interacting with the public and supervisors, as set forth in the explanations by the more recent agency psychological consultants. The rest of the limitations addressed plaintiff's problems of concentration, persistence and pace, and ability to adapt and manage herself. (Tr. at 1475.) The ALJ explained that the limitation to simple tasks, no fast-paced work, and simple decisions accounted for plaintiff's lesser ability to concentrate, persist and maintain pace, and the limitation on workplace changes addressed her problems of adaptation. (Tr. at 1475-76.)

The ALJ next addressed the various opinions from plaintiff's treating providers. The ALJ acknowledged that, in general, more weight is given to the opinions of treating sources because they are usually able to provide a detailed and longitudinal picture of the claimant's impairments. Treating source opinions are given "controlling weight" if well supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with the other substantial evidence in the record. If the opinion is not given controlling weight, the ALJ must consider it under the factors set forth in 20 C.F.R. § 416.927. The ALJ declined to give controlling weigh to the treating sources' opinions in this case. (Tr. at 1476.)

28

The ALJ first considered the February 2018 opinion from Dr. Bremberger, plaintiff's primary physician. Dr. Bremberger opined that plaintiff could sit for less than two hours in a workday and stand/walk for less than two hours in a workday, and that she had to lay down for the remainder due to fatigue, lower extremity edema, and pain. Dr. Bremberger further opined that plaintiff had to elevate her legs at or above heart level for at least two hours during a typical eight-hour daytime period due to lower extremity edema. Dr. Bremberger also opined that plaintiff could occasionally handle or finger, but that her upper extremity functioning would be significantly more impaired at least several days per month. Finally, Dr. Bremberger determined that plaintiff required four unscheduled breaks during the workday, would be off task 25% of the time, and would miss more than four days of work per month. (Tr. at 1476, citing Tr. at 597-601.)

The ALJ noted that Dr. Bremberger began treating plaintiff in December 2016, listing diagnoses of fibromyalgia, chronic pain syndrome, peripheral neuropathy, physical de-conditioning, chronic venous insufficiency, obesity, and diabetes. Although Dr. Bremberger was a treating source who had the opportunity to observe plaintiff on numerous occasions, the ALJ gave her opinion little weight. (Tr. at 1476.)

First, the ALJ noted that Dr. Bremberger typically treated plaintiff's acute illnesses (and her diabetes for a period), while plaintiff's fibromyalgia and chronic pain were treated by other specialists. (Tr. at 1476.) The record contained no opinion from a specialist who treated plaintiff's fibromyalgia supporting significant work-related limitations. (Tr. at 1477.)

Second, Dr. Bremberger offered her opinions on a checkbox style form, which did not clearly explain which medical impairments caused specific work-related limitations. Nor did Dr. Bremberger identify medical evidence supporting the majority of the limitations set forth. (Tr.

29

at 1476.)

Third, the ALJ found Dr. Bremberger's opinion inconsistent with the record as a whole. As to plaintiff's fibromyalgia, chronic pain, and physical de-conditioning, the evidence showed that plaintiff had good tolerance to the progression of endurance tasks and activities during aquatic therapy, with a decrease in her overall pain with this treatment. (Tr. at 1477, citing Tr. at 1035, 1047.) The specialist who treated plaintiff's fibromyalgia, Dr. Kleen, observed that plaintiff exhibited no muscle atrophy and a normal gait despite the physical de-conditioning due to this impairment, and she appeared alert and oriented despite reported sleep difficulties. (Tr. at 1477, citing Tr. at 1054-55.) While Dr. Bremberger did not typically treat plaintiff's fibromyalgia, her progress notes stated that the condition was stable in early 2018. (Tr. at 1477, citing Tr. at 2365.) As to her obesity, diabetes, and neuropathy, Dr. Bremberger's treatment notes reflected largely normal physical examinations with no edema. (Tr. at 1477, citing Tr. at Tr. at 1223, 1268-69.) A diabetic examination by a podiatrist in the fall of 2018 revealed some edema in the lower legs, but normal 5/5 muscle strength, symmetrical muscle mass, and full range of motion (Tr. at 1477, citing Tr. at 2411), and an endocrinology visit in July 2018 revealed no pedal edema and no sensory deficit (Tr. at 1477, citing Tr. at 2300).

Fourth, the ALJ noted that Dr. Bremberger had previously expressed discomfort offering an opinion about disability. In July 2017, Dr. Bremberger stated she was not comfortable signing a form to excuse plaintiff from federal student loans due to disability. (Tr. at 1477, citing Tr. at 1260.) In November 2017, Dr. Bremberger declined to complete a form for a work exemption program, noting that plaintiff was then working part-time. (Tr. at 1477, citing Tr. at 1317.) Given these statements, it was unclear to the ALJ why Dr. Bremberger elected to complete the checkbox questionnaire in February 2018, setting forth such significant

30

limitations. (Tr. at 1477.) The ALJ saw nothing in Dr. Bremberger's treatment notes or the other medical evidence establishing that plaintiff's condition significantly worsened as of February 2018. (Tr. at 1477-78.) Finally, the ALJ noted that Dr. Bremberger stated, several months before the alleged onset date, that plaintiff had no restrictions for participating in an exercise program at the YMCA. (Tr. at 1478, citing Tr. at 1167.)

The ALJ next considered the opinions of plaintiff's former psychiatrist, Dr. Schenck, who completed a form in September 2017 stating that plaintiff had mental conditions that prevented her from engaging in substantial gainful activity. Dr. Schenck indicated that plaintiff suffered from frequent unpredictable shifts in mood and anxiety, the daily affliction of major psychiatric symptoms, and great variability in her ability to interact with other people. (Tr. at 1478, citing Tr. at 595.) In March 2018, Dr. Schenck offered another medical opinion with significant restrictions, including more than four absences per month, at least marked limitations for interacting with others, and at least marked limitations for concentration, persisting, or maintaining pace. (Tr. at 1478, citing Tr. at 2055-60.)

The ALJ noted that Dr. Schenck treated plaintiff in the years prior to the alleged onset date, up to September 2016. Although Dr. Schenck had the opportunity to regularly observe plaintiff at visits in the past, the ALJ gave little weight to his opinions because they were inconsistent with the medical evidence, including Dr. Schenck's clinical findings. The ALJ noted that in September 2016, at their last visit, Dr. Schenck stated that plaintiff's PTSD, depression, and anxiety were stable with medications. (Tr. at 1478, citing Tr. at Tr. at 923.) Dr. Schenck also documented that plaintiff had a largely normal mental status exam at that time. (Tr. at 1478, citing Tr. at 925.) During previous appointments, Dr. Schenck similarly observed mostly good functioning, including a groomed appearance, logical thought content,

31

intact memory, and focused attention span/concentration. (Tr. at 1478, citing Tr. at 925, 940, 944, 956.) Likewise, the treatment notes from plaintiff's current provider, nurse practitioner Kosicek, revealed that plaintiff frequently exhibited good function (with some exceptions). Kosicek's clinical findings showed that plaintiff had fairly unremarkable mental examinations with adequate concentration, a cooperative and friendly attitude, and good insight on many occasions. (Tr. at 1478, citing Tr. at 614, 625, 635-36, 646-47, 657-58, 669-70, 681-82, 701-02.) The ALJ found these treatment records inconsistent with Dr. Schenck's 2017 and 2018 opinions, which were offered after he stopped treated her. Further, the ALJ found Dr. Schenck's statement about great variability in plaintiff's capacity to interact with others vague and inconsistent with the clinical findings. (Tr. at 1478.)

The ALJ next considered the February 2018 report from therapist Tauer. Tauer assessed marked limitations in each of the four paragraph B criteria, opining that plaintiff had substantial restrictions associated with fatigue, relating to others in the workplace, missing work due to symptoms or treatment, traveling independently, need for unscheduled breaks, need for supervision, and ability to adjust to changes. (Tr. at 1479, citing Tr. at 714-20.)

The ALJ noted that Tauer started treating plaintiff for bipolar disorder and anxiety disorder in March 2017, seeing her once or twice per week, affording her the opportunity to observe plaintiff on numerous occasions. Nevertheless, the ALJ gave Tauer's opinion little weight because it was not supported by and consistent with the evidence. The ALJ noted that Tauer's treatment notes typically documented plaintiff's subjective reports and summaries of their interactions during sessions; they did not usually document complete mental examinations and thus did not establish that Tauer was able to rely on mental status exams when offering opinions about areas such as memory, concentration, and understanding. Rather, the

32

treatment records suggested that Tauer primarily relied on plaintiff's subjective reports. The ALJ further noted that Tauer based her opinion in part on plaintiff's fibromyalgia symptoms, but any opinion about plaintiff's physical limitations was outside Tauer's area of expertise. Moreover, the objective findings documented in other treatment records were inconsistent with Tauer's opinion. At an initial consultation with Christen Family Solutions in March 2017, another provider observed that plaintiff appeared disheveled with an anxious mood, congruent affect, and variable concentration. However, she also exhibited a cooperative attitude, normal speech, normal attention, intact memory, average fund of knowledge, intact judgment, fair insight, average intelligence, coherent thought processes, relevant thought content, and no hallucinations or delusions. (Tr. at 1479, citing Tr. at 724.) Likewise, Kosicek's treatment records revealed that plaintiff frequently exhibited good function on exam (with some exceptions) such as adequate concentration, cooperative and friendly attitude, and good insight. (Tr. at 1479, citing Tr. at 614, 625, 635-36, 646-47, 657-58, 669-70, 681-82, 701-02.)

The ALJ next considered nurse practitioner Kosicek's opinion from February 2018, in which Kosicek opined that plaintiff had substantial restrictions associated with fatigue, relating appropriately to others in the workplace, missing work due to symptoms or treatment, traveling independently, need for unscheduled breaks, need for supervision, and the ability to adjust to change. Kosicek further assessed that plaintiff had at least marked limitations in the four paragraph B criteria. (Tr. at 1479, citing Tr. at 589-94.)

The ALJ noted that Kosicek started treating plaintiff in March 2017, seeing her regularly for psychotherapy and medication management. (Tr. at 1479.) As with Tauer, the ALJ found that while Kosicek had the opportunity to regularly observe plaintiff, her opinion was entitled to little weight because it was inconsistent with the medical evidence, including Kosicek's own

33

clinical findings.  (Tr. at 1480.)

For instance, Kosicek's notes in December 2017 stated that plaintiff was well groomed with a cooperative and friendly attitude, appropriate affect, normal motor activity, intact and adequate concentration, intact judgment, good insight, good attention span, and no suicidal thoughts.  (Tr. at 1480, citing Tr. at 625.)  Similarly, Kosicek observed in February 2018 that plaintiff presented with a friendly, cooperative, and open attitude, an appropriate affect, normal thought content without suicidal intent, intact and adequate concentration, intact judgment, good insight, and intact memory.  (Tr. at 1480, citing Tr. at 614.)  Kosicek's notes documented other examinations wherein plaintiff exhibited reasonably good mental function.  (Tr. at 1490, citing Tr. at 635-36, 646-47, 657-58, 669-70, 681-82, 701-02.)

Kosicek did note increased problems on some occasions for which plaintiff required treatment.  In October 2018, Kosicek's exam findings contained a number of abnormalities including a disheveled appearance, guarded and easily distracted attitude, fluctuating level of awareness, limited eye contact, depressed and tearful affect, hyperactive motor activity, speech that was slow, soft and monotone, loose but linear thought flow, and fluctuating concentration.   However, Kosicek's exam also had some good findings including full orientation, the ability to follow commands, the ability to recall a time-line of events, logical and organized thought processes/form, and no hallucinations or delusions.  (Tr. at 1480, citing Tr. at 2448-49.)  Kosicek adjusted plaintiff's medication regimen to better control the symptoms. (Tr. at 1480, citing Tr. at 2450.)  In January 2019, Kosicek encouraged plaintiff to seek inpatient care after she reported increased symptoms including not wanting to live due to pain and depression.  (Tr. at 1480, citing Tr. at 1894.)  But other records from later in 2019 indicated that plaintiff was happy with the medication adjustments and felt less flat, not depressed, and not

34

too moody. (Tr. at 1480, citing Tr. at 1870.) Kosicek observed some abnormalities (such as with her mood and affect) but speech with a normal rate and volume, an appropriate attitude, intact attention span and concentration, orientation within normal limits, intact memory, intact abstract reasoning, and the ability to complete simple computations. (Tr. at 1480, citing Tr. at 1871.)

Finally, the ALJ found that Kosicek's opinion was not supported by the mental status exams of other providers. For example, Dr. Bremberger documented mostly good mental function during exams, such as normal mood and affect, normal behavior, and normal judgment and thought content. (Tr. at 1480, citing Tr. at 1121-1438.)

The ALJ next considered the March 2018 opinion from Linda Johnson, MA, LP, plaintiff's therapist from 2008 to 2016. (Tr. at 1480.) Johnson opined that plaintiff needed to lie down three or more hours in an eight-hour daytime period due to chronic pain, fatigue, and mood fluctuations; would have difficulties interacting with or working in proximity to others in a workplace several times per week; would miss work more than four days per month due to emotional problems and lack of physical stamina; would be unable to consistently and independently leave her residence more than four days per month; would require unscheduled breaks four to five times per day; would be off task due to limitations in attention and concentration more than 30% of the workday; would perform full-time work on a sustained basis less than 50% of the time due to difficulties persisting with tasks and maintaining work pace; would require extra supervision one to two times per day to complete tasks; and had a minimal capacity to adapt to changes in her environment or to changes that were not already part of her daily life. Johnson further opined that plaintiff had at least marked limitations in all four areas of the paragraph B criteria. (Tr. at 1481, citing Tr. at 916-22.)

35

The ALJ noted that Johnson saw plaintiff regularly for counseling, completing handwritten notes documenting mental health symptoms, life stressors, and life events. (Tr. at 1481, citing Tr. at 776-884.) Johnson believed plaintiff had bipolar disorder, PTSD, and anxiety disorder. Even though Johnson was a treating provider who had the opportunity to observe plaintiff on a regular basis during sessions in the past, the ALJ gave little weight to her opinion because it was not supported by or consistent with the evidence as a whole. (Tr. at 1481.)

First, the ALJ noted that Johnson rendered her opinion in March 2018, well over a year after plaintiff left Minnesota; Johnson did not treat plaintiff during the alleged period of disability. Second, the ALJ stated that Johnson's treatment notes typically documented plaintiff's subjective reports about her mental health symptoms, life stressors, and life events; the notes did not document clinical findings from full mental status examinations. (Tr. at 1481, citing Tr. at 776-884.) This, the ALJ said, suggested that Johnson's opinion was primarily based on subjective reports. (Tr. at 1481.) Third, the ALJ found Johnson's opinion inconsistent with other treatment records throughout the period at issue. The treatment records showed that plaintiff exhibited reasonably good mental function during examinations (with some exceptions) despite her reports of mental health symptoms. Among other things, the progress notes showed that plaintiff exhibited a cooperative and friendly attitude, appropriate affect, intact and adequate concentration, intact memory, average fund of knowledge, and no hallucinations or delusions. (Tr. at 1481, citing Tr. at 602-713, 723-75.) Finally, Johnson based her opinion in part on plaintiff's reports about fibromyalgia, and restrictions due to physical impairments were outside Johnson's area of expertise. (Tr. at 1481.)

Lastly, the ALJ considered a January 2019 report from Wicker, plaintiff's current mental

36

health counselor. (Tr. at 1481, citing 2511-16.) Wicker asserted that plaintiff would need to lie down due to fatigue or related symptoms three or more hours during an eight-hour work period. Wicker declined to offer opinions on several questions—about relating appropriately to others, missing work, and the need for unscheduled breaks—stating that these areas were not applicable because plaintiff was unemployed. (Tr. at 1481.) Wicker then asserted that plaintiff would be precluded from work by being off task more than 30% of a typical workday, would efficiently perform full-time work on a sustained basis less than 50% of the time, could not perform detailed work tasks due to anxiety, and would require extra supervision three or more times per day. (Tr. at 1481-82.) Wicker also concluded that plaintiff had at least marked limitations in the paragraph B criteria. (Tr. at 1482.)

Wicker also wrote a letter on plaintiff's behalf in October 2019, stating that she had met with plaintiff on a weekly basis for the past year. (Tr. at 1482, citing Tr. at 1869.) According to the letter, plaintiff was severely emotionally impaired due to childhood abuse, and Wicker thought that plaintiff had a personality disorder characterized by avoidance. The letter further indicated that plaintiff would be unable to work until she overcame her need for protection. Wicker stated that plaintiff felt that she needed protection in all situations, and she suffered from panic attacks if in a new, unfriendly, or unfamiliar situation. Wicker asserted that plaintiff was unable to function and terrorized if trying to work by herself. According to the letter, plaintiff almost never went anywhere without her parents. Wicker noted that plaintiff declined to meet for counseling sessions at a coffee shop because she preferred to meet in a private room at the library. (Tr. at 1482.)

The ALJ found that although Wicker met with plaintiff on a regular basis to discuss mental health problems, her statements were entitled to little weight. First, plaintiff's attorney

stated at the hearing that he did not think Wicker took notes during the sessions, and there were no medical records from Wicker to support the opinion. It appeared that Wicker did not even keep notes and, instead, she and plaintiff met at the library to talk. Second, Wicker was not a psychiatrist, psychologist, or physician, and her responses to the questionnaire were mostly conclusory and inconsistent with other evidence in the medical records. Third, Wicker's letter primarily contained a summary of plaintiff's subjective reports, as opposed to clinical findings. (Tr. at 1482.)

In sum, the ALJ found the RFC supported by the medical evidence and consistent with the agency consultants' opinions, with a few exceptions. While the record contained numerous treating source opinions about marked mental limitations, these opinions were inconsistent with the medical evidence. (Tr. at 1482.)

At step four, the ALJ found that plaintiff could not perform her past relevant work as an instructor (light, skilled) and administrative assistant (sedentary, skilled), because the RFC reduced her to sedentary work and contained non-exertional mental limitations precluding the performance of skilled work. (Tr. at 1482-83.) At step five, however, the ALJ found that plaintiff could perform other jobs, as identified by the VE at the previous hearing, including document preparer and sorter. (Tr. at 1483.) The ALJ accordingly found plaintiff not disabled and denied her applications. (Tr. at 1484.)

On July 24, 2020, the Appeals Council denied review of the ALJ's decision on the two consolidated applications. (Tr. at 1439.) This action followed.

## II. DISCUSSION

As indicated above, plaintiff challenges the ALJ's RFC determination, evaluation of her statements, and assessment of the medical opinions. I address each argument in turn.

**A.    RFC**

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 SSR LEXIS 5, at *1.  "The RFC assessment must be based on all of the relevant evidence in the case record," id. at *13, and "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Id. at *14.  The RFC assessment must also include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence and explaining how any material inconsistencies or ambiguities in the evidence were considered and resolved.  Id. at *19.

Plaintiff primarily argues that the ALJ failed to account for her variable functioning in the RFC assessment.  (Pl.'s Br. at 5.)  See Jelinek v. Astrue, 662 F.3d 805, 814 (7th Cir. 2011) ("[W]e have often observed that bipolar disorder, one of Jelinek's chief impairments, is by nature episodic and admits to regular fluctuations even under proper treatment."); Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case.  Suppose that half the time she is well enough that she could work, and half the time she is not.  Then she could not hold down a full-time job.").

Plaintiff takes particular exception to the ALJ's statement that she "frequently exhibited good function upon examination (with some exceptions)."  (Pl.'s Br. at 6; Tr. at 1473, 1478, 1479, 1481.)  She argues that it is unclear to what the phrase "with some exceptions" refers.

39

(Pl.'s Br. at 6.)  She contends that the ALJ's summary of the medical evidence makes little mention of the abnormal findings, overlooking copious notations of, e.g., disheveled appearance, anxious and depressed mood, tearfulness, flat affect, variable eye contact, and limited judgment.  (Pl.'s Br. at 7-8.)

The ALJ did not cite each and every one of these notations, but he did not have to.  See Gedatus, 994 F.3d at 901 ("True, the ALJ's summary does not mention every detail.  But it need not."); Kolar, 695 Fed. Appx. at 161-62 ("ALJs need not comment on every line of every physician's treatment notes, as Kolar's lawyer supposes; it is enough to recognize and respond to the physician's principal conclusions, which the ALJ did."); Pepper v. Colvin, 712 F.3d 351, 363 (7th Cir. 2013) ("[A]n ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence.").  As indicated above, the ALJ acknowledged that at various times plaintiff appeared disheveled, with limited eye contact, depressed and tearful affect, suicidal ideation, and variable concentration.  (Tr. at 1471, citing Tr. at 2448-49; Tr. at 1471, citing Tr. 1894; Tr. at 1471-72, citing Tr. at 1870-71; Tr. at 1479, citing Tr. at 724.)  This is not a case in which the ALJ simply ignored the contrary evidence, as plaintiff alleges.[4]  See Adams v. Saul, No. 20-CV-1014, 2021 U.S. Dist. LEXIS 90295, at *22-23 (E.D. Wis. May 12, 2021) ("Adams' contention that the ALJ cherry-picked periods of improvement while ignoring evidence of symptom exacerbation is not supported by the record. In the ALJ's detailed review of the medical evidence, he noted times when Adams reported worsening symptoms.").

---

[4]In reply, plaintiff contends that the ALJ cited a single treatment note regarding "abnormalities at times" (Pl.'s Rep. Br. at 2, citing Tr. at 2448-49), but that is incorrect, as noted in the attached text.

40

Plaintiff argues that the ALJ credited her statements to providers that she was doing well but largely rejected reports that she was doing poorly. (Pl.'s Br. at 8-9.) As plaintiff concedes, however, the ALJ acknowledged Kosicek's recommendation that plaintiff seek inpatient care in January 2019 and Tauer's February 2018 notation of increased symptoms. (Pl.'s Br. at 9, citing Tr. at 1471-72.) And there is more: earlier in his decision, in the Listing analysis, the ALJ discussed in some detail plaintiff's reported problems with concentration, completing tasks, memory, understanding, following instructions, anger outbursts, irritability, panic attacks, and social withdrawal, contrasting those reports with the suggestions of better functioning in the treatment records.[5]  (Tr. at 1464-66.)  The ALJ again discussed plaintiff's symptoms in determining RFC (Tr. at 1467-82), including her reports of depressed mood, anger outbursts, decreased energy, trauma flashes, and low self-esteem (Tr. at 1470), contrasting those reports with the indications of reasonably good mental function, improvement with treatment, and plaintiff's statements that she was doing well and engaging in increased activities (Tr. at 1470-73). The ALJ specifically grappled with the exacerbations found by Kosicek in October 2018, noting that even then Kosicek (and Dr. Bremberger) documented some good findings (Tr. at 1471), and again in January 2019, noting that by the fall of 2019 plaintiff reported feeling better after a medication adjustment (Tr. at 1471-72).

Importantly, the ALJ never suggested plaintiff was symptom-free, only that she obtained

---

[5]In reply, plaintiff contends that citing earlier parts of the ALJ's decision to rationalize later findings is impermissible. (Pl.'s Rep. Br. at 2.) As the Seventh Circuit has explained, "nothing in the Chenery doctrine prohibits a reviewing court from reading an ALJ's decision holistically." Zellweger v. Saul, 984 F.3d 1251, 1252 (7th Cir. 2021); see also Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant.").

41

some benefit from treatment and was not as severely limited as alleged.  See Valentin v. Saul,

19-CV-1626, 2020 U.S. Dist. LEXIS 166213, at *14-15 (E.D. Wis. Sept. 11, 2020):

> Valentin cites a number of treatment notes that purportedly substantiate the variability in her symptoms.  Although at times Valentin presented with escalating emotional or physical issues, the ALJ reasonably determined that the extreme limitations claimed by Valentin conflicted with reports of some improvement with treatment from 2016 to 2018. . . . This evidence supports the ALJ's finding that, with treatment, Valentin was not as functionally limited as she alleged; the ALJ didn't ignore Valentin's symptoms or find that treatment made her symptom-free.

Plaintiff notes a number of other occasions where she made subjective reports of doing

poorly, which the ALJ failed to mention.  (Pl.'s Br. at 9-10.)  Again, her argument boils down to

a contention that the ALJ placed too much weight on the positive reports and not enough on

the negative, but the court may not substitute its take on the evidence for the ALJ's.  See also

Adams, 2021 U.S. Dist. LEXIS 90295, at * 23-24 (record citation omitted):

> Moreover, these "ignored" records merely show that Adams continued to feel tired, anxious, and depressed.  But the ALJ never claimed that Adams was symptom free.  Rather, he found that Adams' alleged symptoms were not as severe as alleged given his own reports of improvement.  That finding is reasonable, and I will not reweigh the evidence that led the ALJ to that conclusion.

Again, this is not a case where the ALJ "utterly fail[ed]" to acknowledge contrary evidence, see

Moore v. Colvin, 743 F.3d 1118, 1123 (7th Cir. 2014), as plaintiff alleges (Pl.'s Br. at 10).

Plaintiff suggests that some of her reports of doing well may have been evidence of

mania rather than good mental functioning.  (Pl.'s Br. at 11.)  Plaintiff cites no evidence from

any medical provider attributing her positive statements to manic episodes, just her own

subjective reports, so it is hard to see how the ALJ committed reversible error by failing to

suspect mania rather than improvement.  Moreover, as the Commissioner notes, the March

2017 treatment note plaintiff cites in support of this argument offers scant support.  (Def.'s Br.

at 13.)  At that time, plaintiff reported that her manic episodes were worse when she was younger, involving "high risk behavior" and substance abuse, while "lately mania is more just not able to sleep." (Tr. at 399.)  In reply, plaintiff notes that on May 11, 2017, she told Kosicek "I feel SO good!" (Tr. at 548), but on May 25, 2017, she told Tauer that she discontinued a medication because she felt she was becoming manic. (Pl.'s Rep. Br. at 5, citing Tr. at 751.)  But it is hard to see why, based on this notation, the ALJ was required to draw the conclusion that plaintiff's reported improvements were actually signs of mania.

Plaintiff also contends that, in relying on her daily activities, the ALJ overlooked her limitations.  See Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities.").  She notes indications in her reports that she needed to "psych herself up" to go out, needed reminders to shower and take medications, and did little around the house. (Pl.'s Br. at 11-12.)  She further testified to having "bad days" where she did not leave the house and isolated in her room, and that she could not handle even part-time work, quitting her job at the YMCA because she was making mistakes and forgetting what to do. (Pl.'s Br. at 12.)

The ALJ likely should have said more about plaintiff's limitations in what were already rather limited activities.  But any error was harmless, as the ALJ cited several other factors in determining RFC.  See Kuykendoll v. Saul, 801 Fed. Appx. 433, 439 (7th Cir. 2020) (finding any error harmless where the ALJ mentioned daily activities as only one of many factors in assessing RFC).  Moreover, the ALJ did not make the common mistake of equating daily activities with competitive work; rather, he noted that these activities suggested plaintiff's symptoms were not as debilitating as she alleged.  See Rennaker v. Saul, 820 Fed. Appx. 474, 480 (7th Cir. 2020) ("[T]he ALJ's mistake was harmless because the ALJ did not rely on

43

Rennaker's daily activities to the exclusion of other evidence; nor did he equate these activities with competitive work. He noted only that these activities suggested that Rennaker was not as limited as he alleged.").

Finally, plaintiff contends that the ALJ's failure to account for variable functioning was harmful, as the VE testified that the related limitations (absenteeism, time off task, unscheduled breaks, extra supervision) would preclude competitive employment. (Pl.'s Br. at 13, citing Tr. at 78-80.) The ALJ sufficiently considered the conflicting evidence and provided valid reasons for declining to accept those limitations, instead largely crediting the reports of the agency medical and psychological consultants that plaintiff could sustain a range of full-time, unskilled, sedentary work. See Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (affirming where the ALJ found the agency doctors' opinions better supported by the record). In reply, plaintiff notes that the ALJ rejected portions of the consultants' reports, but she fails to explain why that matters. (Pl.'s Rep. Br. at 8.) "The ALJ determines RFC based on the entire record; he need not adopt 'a particular physician's opinion[.]'" Aguilera v. Colvin, No. 13-C-1248, 2014 U.S. Dist. LEXIS 95951, at *68 (E.D. Wis. July 15, 2014) (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).

**B.     Plaintiff's Statements**

In considering a claimant's statements regarding her symptoms and limitations, the ALJ must follow a two-step process. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must determine the extent to which the symptoms limit the claimant's ability to work. Id. at *9. If the statements are not substantiated by objective medical evidence,

44

the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and other treatment the claimant has received for relief of the pain or other symptoms. Id. at *18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26.

Review of an ALJ's symptom evaluation is highly deferential. So long as the ALJ gives specific reasons supported by the record, the court will overturn his determination only if it is "patently wrong." Deborah M., 994 F.3d at 788.

As indicated above, the ALJ followed the two-step process here, providing several reasons for finding plaintiff's statements not entirely consistent with the evidence of record. First, plaintiff reported good improvement in physical functioning with aquatic therapy, which she discontinued due to the hassle of getting there (Tr. at 1469, 1472), and the medical records documented reasonably good physical functioning, despite plaintiff's morbid obesity, with normal cardiovascular and respiratory findings and normal strength in the extremities (Tr. at 1469-70, 1472). Second, the treatment records documented reasonably good mental function, with some exceptions. (Tr. at 1471, 1473.) Third, plaintiff reported that psychiatric medications and therapy were helpful. (Tr. at 1474.) Fourth, plaintiff's activities suggested that she did not suffer from debilitating symptoms, as she was able to go shopping, attend church, visit family, go out to eat with her parents, watch TV, play games, and interact with others on Facebook.

45

(Tr. at 1473.)  Fifth, plaintiff did not seek inpatient mental health treatment during the period at issue.  (Tr. at 1473.)

Plaintiff makes no argument that the ALJ strayed from the regulatory factors.  Rather, she challenges the evidence upon which the ALJ relied in making his findings.  Because the court may not re-weigh the evidence or substitute its judgment for the ALJ's, plaintiff faces an uphill climb in making this argument.  See Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005) (noting that "challenges to the sufficiency of the evidence rarely succeed").

Plaintiff contends that the ALJ's second, third, and fourth reasons rest on a one-sided view of the evidence, as detailed in her first argument.  (Pl.'s Br. at 15.)  For the reasons stated above, that argument fails.

Regarding the ALJ's first reason, plaintiff argues that her improvement with physical therapy does not logically lead to the conclusion that her statements about the limiting effects of her pain are unsupported.  She notes that she engaged in therapy for a short time (from August to October 2017), while the period at issue in this case stretches from March 2017 (the alleged onset) to February 2020 (the date of the ALJ's decision).  She further argues that it is illogical to discount her statements about pain based on her temporary improvement in therapy.  (Pl.'s Br. at 15.)  Plaintiff faults the ALJ for referencing her testimony that she stopped attending because the hassle of getting there was not worth the benefit of doing it, omitting her further testimony that the improvement was short-term.  (Pl.'s Br. at 16, citing Tr. at 1508.)

This again boils down to a contention that the ALJ placed too much weight on a particular piece of evidence.  Plaintiff makes no argument that it was improper for the ALJ to cite the water therapy records, nor could she, as the regulations required the ALJ to consider the treatment plaintiff received for her pain and other symptoms.  As the ALJ discussed,

46

plaintiff saw a number of specialists for her fibromyalgia, receiving recommendations for physical therapy and medications. (Tr. at 1468.) Plaintiff noted no benefit from prescription medications (Tr. at 1469), instead using Tylenol for pain relief (Tr. at 1468), but the therapy appeared to produce significant benefit (Tr. at 1469).

Plaintiff faults the ALJ for failing to cite the portion of an October 2017 treatment note in which she told a provider that she did not feel the therapy "helped her pain." (Pl.'s Br. at 16, citing Tr. at 1054). But in that same note, plaintiff told the provider that the therapy "helped her see that she can do more than the thought." (Tr. at 1054.) I cannot find reversible error based on the ALJ's failure to further discuss this one record.[6] Plaintiff's argument that the ALJ placed too much weight on the water therapy records is further undermined by his provision of several other reasons, which plaintiff does not specifically contest.

As to the fifth reason, plaintiff correctly notes that there is no requirement in social security law that a claimant require hospitalization in order to demonstrate a disabling mental impairment. Worzalla v. Barnhart, 311 F. Supp. 2d 782, 796 (E.D. Wis. 2004); see also Wallace v. Barnhart, 256 F. Supp. 2d 1360, 1371 (S.D. Fla. 2003) ("Although hospitalizations may add to the strength of a disability claim, [they] are not an essential element in establishing a severe impairment."). But the ALJ did not impose such a requirement here; instead, he considered the nature and extent of the claimant's treatment, as the regulations require. Ultimately, even if this reason added little to the ALJ's analysis, it provides no basis for reversal. See Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons

---

[6]Although the ALJ did not specifically mention the quotes in the text, he did discuss plaintiff's October 2017 follow up with Dr. Kleen, during which she made these statements. (Tr. at 1469, citing Tr. at 1054-55.)

47

must be valid as long as <u>enough</u> of them are, and here the ALJ cited other sound reasons for disbelieving Halsell.") (internal citations omitted).

Plaintiff concludes that, as with her first argument, the error was harmful, as acceptance of her testimony that she could not leave the house at least weekly, made mistakes and forgot how to do her part-time job, and tended to read the same sentence over and over would preclude the performance of full-time work. (Pl.'s Br. at 17.) The ALJ provided sufficient reasons for declining to accept these claims, supported by the evidence and consistent with the regulatory factors.

## C.    Providers' Opinions

Under the regulations applicable to plaintiff's claim,[7] the ALJ should generally give more weight to the medical opinion of treating source than to the opinion of a source who did not treat the claimant. 20 C.F.R. § 416.927(c)(1). This is so because treating sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments. <u>Id.</u> § 416.927(c)(2).

If a treating source's medical opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the ALJ will give it "controlling weight." <u>Id.</u> If a treating source's medical opinion is not given controlling weight, the ALJ must decide how value it does have, considering the length, nature, and extent of the treatment relationship; the support provided

---

[7]Plaintiff filed the first application at issue on March 24, 2017, just before the Commissioner's regulations regarding medical opinions changed. <u>See</u> <u>Gerstner v. Berryhill</u>, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating-physician rule applies only to claims filed before March 27, 2017). As required by the Appeals Council's remand order, the ALJ applied the prior rules to the consolidated case. (Tr. at 1458.)

48

by the source for the opinion; the consistency of the opinion with the record as a whole; the source's specialization, if any; and the source's familiarity with the social security disability program and its evidentiary requirements. Id. § 416.927(c)(2)-(6). The ALJ must provide "good reasons" for discrediting a treating source's medical opinion. E.g., Stocks v. Saul, 844 Fed. Appx. 888, 892 (7th Cir. 2021).

Under the applicable regulations, only opinions from "acceptable medical sources," such as licensed physicians or psychologists, may be given controlling weight. 20 C.F.R. § 416.902(a). Opinions from other medical sources, such as therapists or nurse practitioners, must be considered but may not receive controlling weight. See, e.g., Kirkling v. Berryhill, No. 2:16-cv-00412, 2017 U.S. Dist. LEXIS 99929, at *11, 15 (S.D. Ind. June 28, 2017). These opinions are otherwise evaluated under the same factors used to evaluate reports from acceptable medical sources. See, e.g., Cole v. Berryhill, No. 17-CV-1366, 2018 U.S. Dist. LEXIS 157077, at *18 (E.D. Wis. Sept. 14, 2018).

### 1.    Dr. Bremberger

Dr. Bremberger, plaintiff's primary physician, endorsed a number of work-preclusive limitations, including that plaintiff could not sit/stand/walk for a total of eight hours, would be off task 25% of the workday, would require four unscheduled breaks, could only occasionally handle and finger, would be absent more than four days per month, and would need to elevate her legs at least two hours per workday. (Tr. at 597-600.) As indicated above, the ALJ acknowledged Dr. Bremberger's status as a treating source but gave her opinions little weight because she typically treated plaintiff for acute illnesses, with other specialists addressing plaintiff's fibromyalgia and chronic pain; the opinions were set forth in a checklist style form, without supporting explanation; the opinions were inconsistent with the medical evidence,

49

including plaintiff's improvement with therapy and the physical exam findings of no muscle atrophy, normal gait, normal muscle strength, full range of motion, and no or only some edema; Dr. Bremberger had previously declined to complete disability forms, with the record giving no indication that plaintiff's condition had worsened after the previous refusals; and Dr. Bremberger stated, several months before the alleged onset date, that plaintiff had no restrictions for participating in an exercise program. (Tr. at 1476-78.)

Plaintiff develops no argument that the ALJ's analysis strayed from the regulatory factors. Instead, she again challenges the ALJ's weighing of the evidence pertinent to the factors. Given the standard of review, she again faces an uphill climb. See Schmidt, 395 F.3d at 744.

Plaintiff acknowledges that Dr. Bremberger provided general care, with other specialists addressing the severe impairments at issue, but she contends that this is only one factor to consider. (Pl.'s Br. at 20.) The ALJ did not suggest otherwise, providing several additional reasons for his conclusion. It was appropriate for the ALJ to note Dr. Bremberger's lack of specialization as part of the analysis.

Plaintiff contends that the limitations on sitting and standing tolerance relate to fatigue, pain, and lower extremity edema, and that these symptoms are well-documented in the record. (Pl.'s Br. at 20.) While Dr. Bremberger checked boxes corresponding to a number of symptoms on the diabetes medical source statement (Tr. at 597), she did not specifically relate those symptoms to, or otherwise explain the basis for, the severe exertional limitations she endorsed in this report (Tr. at 598). Moreover, the ALJ acknowledged plaintiff's reports of pain and fatigue (Tr. at 1468) but concluded that her allegations of disabling symptoms and limitations were not consistent with the record as a whole. See White v. Barnhart, 415 F.3d

50

654, 659 (7ᵗʰ Cir. 2005) (rejecting treating source opinion based on the claimant's subjective complaints, which the ALJ found not credible).

Dr. Bremberger endorsed the requirement of leg elevation in a "lower extremity edema" report (Tr. at 600), but the ALJ discussed the reports of edema in some detail. On April 25, 2017, Dr. Bremberger noted no edema. (Tr. at 1477, citing Tr. at 1223.) She also stated that plaintiff's edema had improved on medication. (Tr. at 1477, citing Tr. at 462.) On July 25, 2017, Dr. Bremberger again noted no edema. (Tr. at 1477, citing Tr. at 1268-69.) On July 6, 2018, plaintiff's treating endocrinologist noted no pedal edema. (Tr. at 1477, citing Tr. at 2300.) And in September 2018, during a diabetic exam by a podiatrist, plaintiff had some edema in the lower legs, but the exam was otherwise mostly unremarkable. (Tr. at 1477, citing Tr. at 2411.) Plaintiff cites other record references to +1 pitting edema (Tr. at 2082, 2095) and trace to mild pitting edema (Tr. at 376), but she does not explain why these findings demonstrate error in the ALJ's evaluation of Dr. Bremberger's opinion.[8] The ALJ acknowledged that plaintiff demonstrated edema at times but concluded that the condition was not sufficiently serious to require leg elevation for multiple hours per day.

Plaintiff contends that Dr. Bremberger's opinions as to absenteeism, time off task, and unscheduled breaks are consistent with and supported by the evidence of variable functioning raised in her first argument, as well as by her part-time work experience. (Pl.'s Br. at 20-21.) I addressed plaintiff's variable functioning argument above; the ALJ adequately considered the up and downs in plaintiff's condition. The ALJ also noted plaintiff's contention that she was unable to continue her part-time job at the YMCA (Tr. at 1467) but ultimately found her claims

---

[8]Pitting edema is graded on a scale of 1+ to 4+, with 1+ being the least serious. https://www.webmd.com/heart-disease/pitting-edema (last visited October 22, 2021).

51

of disabling symptoms and limitations inconsistent with the record as a whole (Tr. at 1472).

Plaintiff next argues that the use of a checklist form is no reason to reject the opinion, particularly when the opinions are supported by other evidence in the record. (Pl.'s Br. at 21, citing Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records.").) The ALJ did not reject the report based solely on its format, and it was appropriate for him to note that Dr. Bremberger offered no explanatory support for the limitations. See, e.g., Blackburn v. Berryhill, No. 4:17-cv-00035, 2018 U.S. Dist. LEXIS 169237, at *14 (S.D. Ind. Mar. 15, 2018) ("[T]he ALJ properly considered the fact that the opinions were 'checkbox' as one factor among several that tilted against assigning greater weight to their opinions."), adopted, 2018 U.S. Dist. LEXIS 168594 (S.D. Ind. Sept. 30, 2018). Cf. Larson, 615 F.3d at 751 (noting that the doctor did make comments where possible).

Plaintiff next faults the ALJ for relying on various normal exam findings, which say nothing about the severity of her fibromyalgia. (Pl.'s Br. at 21.) The ALJ acknowledged that the examinations confirmed abnormalities associated with fibromyalgia, including pain and tender points. (Tr. at 1468, citing Tr. 905.) The ALJ primarily relied on the normal physical exam findings in discussing plaintiff's obesity, diabetes, and neuropathy. (Tr. at 1470, 1477.) The ALJ thus did not make the same mistake as in the cases plaintiff cites, i.e., discounting a fibromyalgia claimant's pain allegations based on the absence of "objective" medical support. (Pl.'s Br. at 22, citing Alexander v. Barnhart, 287 F. Supp. 2d 944, 965-66 (E.D. Wis. 2003); Gister v. Massanari, 189 F. Supp. 2d 930, 934-35 (E.D. Wis. 2001).) Plaintiff develops no argument that it was error for the ALJ to rely on the normal exam findings (e.g., full strength, normal range of motion and gait, no muscle atrophy) in discussing her overall physical

52

functioning.

Plaintiff acknowledges that on two previous occasions Dr. Bremberger declined to complete disability forms, as the ALJ said. (Pl.'s Br. at 22.) In July 2017, Dr. Bremberger indicated she was "not comfortable" completing a form excusing plaintiff from federal student loans due to disability. (Tr. at 1270.) In November 2017, Dr. Bremberger declined to complete a work excuse form, stating: "I am unable ethically to complete her form today as she is currently working." (Tr. at 1317.) Plaintiff contends that the ALJ should not have relied on the first declination without knowing what the form asked or why Dr. Bremberger was uncomfortable signing it. (Pl.'s Br. at 22.) And Dr. Bremberger appeared to base the second declination on a mistake of law, as a person can be employed (at least below the SGA level) and still be found "disabled" under the Social Security Act. (Pl.'s Br. at 23.)

To the extent plaintiff contends the ALJ was required to go behind the medical records and determine Dr. Bremberger's thought process, she asks too much. While ALJs have a general duty to develop the record, it is the claimant's burden, not the ALJ's, to prove that she is disabled. Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017). Moreover, because plaintiff was represented by counsel at the hearing in this case, she is presumed to have made her best case before the ALJ. Id.

Finally, plaintiff challenges the ALJ's reliance on Dr. Bremberger's December 2016 release for plaintiff to participate in an exercise program at the YMCA without restrictions. (Pl.'s Br. at 23.) Plaintiff notes that this release came before the alleged onset date, but the ALJ said as much in his decision. (Tr. at 1478, citing Tr. at 1167.) Since this release came just a few months before the onset date, and plaintiff alleged no traumatic or triggering event in the interim, this was relevant evidence. Plaintiff further argues that her ability to participate in an

53

exercise program does not mean she can engage in competitive full-time employment. (Pl.'s Br. at 24.) The ALJ never said it did. Rather, he cited the release as evidence undermining the severe restrictions set forth in Dr. Bremberger's February 2018 report, further noting the absence of medical evidence that plaintiff's condition had significantly worsened from late 2016 to early 2018. (Tr. at 1477-78.) Plaintiff develops no argument that the ALJ erred in finding that her condition did not worsen during this time.

### 2.    NP Kosicek and Therapist Tauer

Kosicek and Tauer both endorsed a number of work-preclusive limitations, indicating that plaintiff needed to lie down three or more hours during the workday, would miss more than fours days per month, would need two or three unscheduled breaks during the workday, would be off task 30% of the time, and would require an unusual level of supervision to complete even simple work tasks several times per day. They further opined that she had marked limitations in each of the paragraph B criteria. (Tr. at 589-93, 714-18.) The ALJ gave Tauer's report little weight because her notes typically documented plaintiff's subjective reports rather than complete mental status examinations, suggesting that Tauer primarily relied on plaintiff's reports; Tauer based her opinion in part on plaintiff's fibromyalgia symptoms, which exceeded her area of expertise; and the objective findings documented in other treatment records, including Kosicek's, were inconsistent with Tauer's opinions.  (Tr. at 1479.)  The ALJ discounted Kosicek's report as inconsistent with the evidence, including Kosicek's own clinical findings.  While Kosicek noted increased symptoms on some occasions, plaintiff generally exhibited reasonably good mental functioning and medication adjustments helped to better control the symptoms. (Tr. at 1480.)

Plaintiff again contends that the ALJ misconstrued the record in discussing her ups and

54

downs, as indicated in her first argument.  (Pl.'s Br. at 25.)  For the reasons stated above, the ALJ did not err in failing to mention all of the records documenting plaintiff's increased symptoms.

Plaintiff argues that Tauer did include some objective findings in her notes, providing a long string cite from the record.  (Pl.'s Br. at 25.)  The ALJ discussed some of those findings earlier in his decision, indicating that Tauer's notes from the summer and fall of 2018 documented an anxious mood but cooperative behavior, full orientation, and logical and coherent thought processes.  (Tr. at 1472, citing Tr. at 2499-2505.)  In any event, plaintiff does not explain how any of these notations support the limitations in Tauer's report.  Nor does she contest the ALJ's broader point—that Tauer's notes did not typically include complete mental status examinations but rather focused mostly on subjective reports.[9]  Plaintiff also says nothing about the ALJ's finding that Tauer's opinions exceeded her expertise.  To the extent plaintiff argues Tauer's report is supported by Kosicek's notes, the ALJ sufficiently discussed those notes.[10]

Finally, while providers are permitted to rely on their patients' descriptions of their conditions, see, e.g., Brown v. Barnhart, 298 F. Supp. 2d 773, 792-93 (E.D. Wis. 2004), as

_____

[9]In reply, plaintiff suggests that the ALJ may have overlooked Tauer's observations completely, since they were not part of a complete mental status exam.  (Pl.'s Rep. Br. at 9.)  The ALJ's decision belies the suggestion, as he discussed several of those reports and observations earlier in his decision.  (Tr. at 1472.)

[10]As the Commissioner notes, while plaintiff lumps these two opinions together in her brief, the ALJ analyzed them separately, providing different reasons for his conclusions.  (Tr. at 1479-80.)  Plaintiff develops no specific argument that the ALJ erred in evaluating Kosicek's opinion.  In reply, plaintiff notes that the ALJ provided similar reasons (Pl.'s Rep. Br. at 9), but that is not surprising given the similarities in the reports, which were completed on the same day.

55

plaintiff notes (Pl.'s Br. at 25), ALJs may discount medical opinions that are based solely on the claimant's subjective complaints, <u>Filus v. Astrue</u>, 694 F.3d 863, 868 (7th Cir. 2012). The ALJ did not err by including this as one reason for discounting Tauer's report.

### 3. Dr. Schenck and Therapist Johnson

Dr. Schenck, plaintiff's prior psychiatrist, endorsed a number of work-preclusive limitations, including the need to lie down due to fatigue, more than four absences per month, excessive breaks, time off task, an unusual level of supervision, and great variability in her ability to interact with others. He further opined that she experienced marked limitations in three of the four paragraph B areas. (Tr. at 2056-60.) Plaintiff's former therapist, Linda Johnson, endorsed similar limitations. (Tr. at 916-21.)

The ALJ discounted Dr. Schenck's opinions, noting that he stopped treating plaintiff well before he offered them, he documented a largely mental status exam at their last visit in September 2016, he observed mostly good functioning during their previous appointments, Kosicek's more recent notes also documented fairly unremarkable mental exams, and Dr. Schenck's statement about great variability in plaintiff's capacity to interact with others was vague and inconsistent with his clinical findings. (Tr. at 1478.) The ALJ discounted Johnson's opinions because she did not treat plaintiff during the alleged period of disability, her treatment notes typically documented plaintiff's subjective reports rather than clinical findings from full mental status examinations, her opinions conflicted with the treatment records during the period at issue, and she based her opinion in part on plaintiff's fibromyalgia thus exceeding her area of expertise. (Tr. at 1481.)

Plaintiff again incorporates her previous arguments in challenging the ALJ's rejection of the Schenck and Johnson reports. (Pl.'s Br. at 26.) For the reason stated above, I find no

reversible error in the ALJ's weighing of the evidence.

Plaintiff specifically challenges the ALJ's reliance on the timing of these reports, noting that Schenck and Johnson treated her for the same impairments found to be severe during the relevant time period. (Pl.'s Br. at 26.) The ALJ acknowledged as much, noting that Schenck and Johnson treated plaintiff for bipolar disorder, PTSD, and anxiety, and that they had the opportunity to regularly observe her during sessions in the past. (Tr. at 1478, 1481.) The ALJ did not reject their reports based solely on the timing, and the regulation required him to consider the length and frequency of the treating relationship. Plaintiff notes that the ALJ was also required to consider specialization, supportability, and consistency. (Pl.'s Br. at 26.) The ALJ did so, noting their credentials, looking for support in their treatment notes, and checking the consistency of their reports with the treatment records during the relevant time.

Plaintiff does not otherwise specifically contest the reasons the ALJ provided for discounting these opinions. Nor, as the Commissioner notes, does she acknowledge that the ALJ considered these opinions separately.

### 4.    Wicker

Debbie Wicker, plaintiff's most recent therapist, produced a report in January 2019, endorsing the need lie down for three or more hours during the day, off task behavior exceeding 30% of a typical workday, and the need for an unusual level of supervision several times per day. She further endorsed marked limitations in all four paragraph B areas of functioning. (Tr. at 2512-16.) In an October 2019 letter, Wicker discussed plaintiff's need for protection and accompaniment by family in unfamiliar circumstances. (Tr. at 1869.)

Wicker produced no medical records and apparently did not keep notes from her sessions with plaintiff, which occurred at a local library; plaintiff's counsel was also uncertain

57

of Wicker's credentials. (Tr. at 1503, 1507.) The ALJ discounted Wicker's opinions because she kept no records and was not an acceptable medical source, her responses were conclusory and inconsistent with other medical evidence, and her letter consisted primarily of a recitation of plaintiff's subjective reports rather than clinical findings. (Tr. at 1482.)

Plaintiff again relies on her previous arguments regarding inconsistency with the medical evidence. (Pl.'s Br. at 27.) For the reasons stated above, I find no reversible error.

Plaintiff argues that Wicker's failure to keep records does not make her opinions "inadmissible" (Pl.'s Br. at 27), but the ALJ never said that it did. He considered her opinions over three lengthy paragraphs in his decision. (Tr. at 1481-82.) The ALJ was required by the regulation to evaluate consistency and supportability, and the absence of relevant records was pertinent to that analysis. Plaintiff also argues that Wicker's opinion was consistent with the notes from other providers documenting fatigue, variable functioning, and inability to sustain a part-time job. (Pl.'s Br. at 27.) As indicated above, the ALJ discussed some of this evidence, and I will not second guess his evaluation.

Plaintiff further argues that the fact that Wicker is not an "acceptable medical source" does not provide reason to discount her opinions. (Pl.'s Br. at 27.) Under the applicable regulations, the fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight because acceptable medical sources "are the most qualified health care professionals." SSR 06-03p, 2006 SSR LEXIS 5, at *12 (rescinded effective Mar. 27, 2017); see also 20 C.F.R. § 416.913. The ALJ did not reject Wicker's opinion based solely on her lack of credentials; he permissibly considered this factor as one reason for giving her opinions less weight. See, e.g., Stacy A. v. Berryhill, No. 17 C 6581, 2019 U.S. Dist. LEXIS 66016, at *11 (N.D. Ill. Apr. 18, 2019) (noting that it is permissible under the

58

applicable regulations for an ALJ to consider, as part of the analysis, that a provider is not an acceptable medical source).

Plaintiff concludes that the ALJ's rejection of the treating source opinions was material, as acceptance of their restrictions would, based on the VE's testimony, lead to a disability finding (as well as a finding of disabled under the Listings at step three). (Pl.'s Br. at 28.) Plaintiff further argues that the court should reverse and award benefits, as these opinions are well-supported by the record. (Pl.'s Br. at 28-29.) Because I find no reversible error in the ALJ's evaluation of the treating provider opinions, I need not discuss remedy.

### III. CONCLUSION

The record in this case contains substantial evidence supporting disability. But it also contains substantial evidence supporting the ALJ's decision. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). The ALJ also sufficiently articulated his reasons for denying the claim, satisfying the deferential standard applicable on judicial review. See Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008). Therefore,

**IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 5th day of November, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

**APPENDIX**

As indicated, plaintiff treated with Dr. Carlos Schenck, a psychiatrist, and Linda Johnson, MACP, a therapist, prior to the alleged onset date, when she lived in Minnesota. The record contains handwritten counseling notes from Johnson dated January 6, 2015, to November 14, 2016, which are difficult to read. (Tr. at 776-811, 841-80.) During a March 16, 2015 visit with Dr. Schenck, plaintiff displayed normal eye contact, a well groomed appearance, normal speech, cooperative attitude, depressed mood, appropriate affect, logical thought content, intact insight and memory, and focused attention/concentration. (Tr. at 815, 960-61.) She reported that insomnia, mood swings, and a pervasive depressed mood hindered her daily functioning. (Tr. at 816.) She further reported doing well enough with her medications, but she was still not able to work on account of her bipolar and anxiety. (Tr. at 817.)

On June 4, 2015, Dr. Schenck noted a normal mental status exam aside from depressed mood. (Tr. at 822.) Plaintiff's parents remained supportive, which was important given the depressed mood, hopelessness, and helplessness she often had every day. They discussed coping strategies, as there was no further pharmacologic remedy Dr. Schenck could offer. (Tr. at 824.)

On August 17, 2015, Dr. Schenck again noted a normal mental status exam aside from depressed mood. (Tr. at 827.) Plaintiff continued to be afflicted with her various symptoms, apart from mood instability, which had been controlled with medications. She continued to live with her parents while struggling with her mental health but was trying part-time work organizing Tupperware parties. Her PTSD symptoms recurred but were "blunted" by her medications. Dr. Schenck adjusted her medications to help with sleep. (Tr. at 829.)

On November 9, 2015, Dr. Schenck noted a normal mental status exam aside from anxious and depressed mood. (Tr. at 832.) He was managing her for bipolar disorder, PTSD, anxiety disorder, and chronic insomnia, noting that she was also challenged by chronic fibromyalgia with generalized pain. He indicated that her mood instability was controlled by medications, the medications also blunted the severity of her PTSD symptoms, and her insomnia was generally controlled by medications. (Tr. at 834.)

On February 8, 2016, Dr. Schenck again noted a normal mental status exam aside from anxious and depressed mood. (Tr. at 836.) She reported working part-time as a Tupperware consultant, which had improved her mental health. Her mood instability remained controlled by medications, her PTSD symptoms were fairly well controlled, medications blunted the severity of her anxiety and depressive symptoms, and her insomnia was generally controlled by medications. (Tr. at 838.)

On March 10, 2016, plaintiff reported being in a manic state for the past month with impulsive actions, fast thoughts, and reduced sleep needs. She was at that time back to baseline apart from poor sleep. On interview, she was calm with normal speech and thought production, without any flight of ideas. However, they agreed to a modest dose increase of her mood stabilizer medication, also adding a new medication for her aggravated insomnia. She was taking some time off from her part-time Tupperware job until she felt more stable and had better sleep. (Tr. at 938.) Mental status exam showed that plaintiff was oriented x3, with normal eye contact, well groomed appearance, normal motor/gait, normal muscle strength/tone, normal speech, cooperative attitude, anxious and depressed mood, appropriate affect, logical thought content (but preoccupied by her recent manic episode and her health),

1

intact insight/judgment, intact memory, and focused attention span/concentration. (Tr. at 940.)

On April 25, 2016, plaintiff "reported remarkable improvement in mood stability and in her sleep with the med changes initiated at our last appt. She is very pleased, and there has also been benefit with improved health and less medical symptoms with her obtaining reliable good sleep, esp. the maintenance of good sleep. Her prolonged PTSD and GAD are stable with therapy." (Tr. at 933.) Dr. Schenck's mental status exam revealed that plaintiff was oriented x3, with normal eye contact, well groomed appearance, normal motor/gait, normal muscle strength/tone, normal speech, cooperative attitude, normal mood, appropriate affect, logical thought content, intact insight/judgment, intact memory, and focused attention span/concentration. (Tr. at 935.)

On June 20, 2016, plaintiff reported that, overall, she felt more stable, and Dr. Schenck noted that her prolonged PTSD and anxiety disorder were stable with pharmacotherapy. Their next appointment would be the last before her move to Wisconsin. (Tr. at 928.) Mental status exam again showed orientation x3, normal eye contact, well groomed appearance, normal motor/gait, normal muscle strength/tone, normal speech, cooperative attitude, normal mood, appropriate affect, logical thought content, intact insight/judgment, intact memory, and focused attention span/concentration. (Tr. at 930.)

On September 1, 2016, Dr. Schenck noted that plaintiff and her parents were moving to Wisconsin to be closer to plaintiff's brother; this was their last appointment. Plaintiff expressed enthusiasm about the move. (Tr. at 923.) Mental status exam again showed that plaintiff was oriented x3, with normal eye contact, well groomed appearance, normal motor/gait, normal muscle strength/tone, normal speech, cooperative attitude, normal mood, appropriate affect, logical thought content, intact insight/judgment, intact memory, and focused attention span/concentration. (Tr. at 925.)

On December 5, 2016, plaintiff established care with Dr. Laura Lietzau after the move to Wisconsin. Dr. Lietzau noted plaintiff's various conditions: diabetes (blood sugars have been labile); bipolar disorder (on medications, needs to re-establish with psychiatry); and fibromyalgia (using Cymbalta, generally well-controlled, but with some worsening pain on the right side since starting a new job at a desk with a computer). (Tr. at 373-74.) Psychiatric exam was normal. (Tr. at 377.) On December 19, Dr. Lietzau noted that plaintiff's diabetes was poorly controlled. (Tr. at 387, 392.) Her fibromyalgia was generally well controlled but with increased generalized pain recently. Plaintiff also had asthma, reporting that she was constantly short of breath and had gained 40 pounds. (Tr. at 388.)

On March 10, 2017, plaintiff established psychiatric care with nurse practitioner Carmen Kosicek at Alay Health. (Tr. at 577.) On mental status exam, she appeared clean, friendly, cooperative, and alert, with appropriate mood and affect, normal speech and motor activity, normal thought content, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 581.) Kosicek diagnosed bipolar disorder and depression, noting that they would consider injection products for treatment. (Tr. at 582.)

On March 17, 2017, plaintiff told Kosicek her medications were helping. (Tr. at 568.) Mental status exam was the same as the previous visit. (Tr. at 575-76.)

On March 22, 2017, plaintiff was seen for a diagnostic evaluation at Christian Family Counseling. She had been working 16 hours/week at the YMCA but was struggling with panic attacks and took a leave of absence. Medication was starting to help; she was handling anger better and having small amounts of motivation. (Tr. at 398.) Mental status exam at that time

2

was mixed: she appeared disheveled and anxious, but with normal speech and unremarkable motor activity. (Tr. at 399.)

On March 28, 2017, plaintiff was seen for right foot and ankle pain. (Tr. at 423, 891, 895.) X-rays of the right foot showed no acute fracture or dislocation, but some mild arthritic changes and soft tissue swelling. (Tr. at 888-89.) X-rays of right ankle showed no fracture or subluxation, but mild osteoarthritis and diffuse soft tissue edema. (Tr. at 890.)

On April 12, 2017, plaintiff saw Caroline Plankers at Alay Health for an Abilify injection. She stated: "I really feel good." (Tr. at 559.) On mental status exam, she appeared clean, friendly, cooperative, and alert; with appropriate mood and affect; normal speech, motor activity, and thought content; intact concentration and judgment; and good insight, memory and attention span. (Tr. at 566-67.)

On April 13, 2017, plaintiff started counseling with Arrian Tauer, MS. (Tr. at 401.) Plaintiff reported that her symptoms had been lower in Minnesota, where she had a good team of providers, increased since her move. She also stated that taking on a new job was too much after the move. (Tr. at 401.) She was to be seen for weekly therapy. (Tr. at 402.)

On April 27, 2017, plaintiff advised Tauer she was struggling with daily tasks due to a fibromyalgia flare and not being connected with a pain specialist. (Tr. at 403.) She was still adjusting to the move to Wisconsin, attempting to create a care team. (Tr. at 404.)

An April 25, 2017, note indicated that plaintiff's right-sided ankle and foot pain had resolved (Tr. at 424), and her range of motion was improved (Tr. at 427). X-rays showed no acute fracture but some degenerative changes. (Tr. at 428.)

On April 25, 2017, plaintiff saw Dr. Lauren Bremberger to establish primary care. She also needed to reestablish care with pain management for her fibromyalgia. Triggers include stress and certain activities. (Tr. at 463.)

On April 28 2017, plaintiff came to her session with Tauer tearful and quiet, concerned about financial struggles. (Tr. at 405, 757.) Her progress rating was "no change." (Tr. at 406, 758.) On May 4, plaintiff reported that she felt like a burden on her parents. She also reported increased physical pain over the last two weeks. She had picked up extra shifts to get out of the house and make more money. (Tr. at 407.) Tauer noted moderate improvement. (Tr. at 408.) On May 11, plaintiff reported feeling very sad, arguing with her father. (Tr. at 409.) Tauer noted steady improvement. (Tr. at 410.)

On May 11, 2017, plaintiff told Kosicek. "I feel SO good." (Tr. at 548.) Mental status exam revealed her to be clean, friendly, cooperative, and alert, with appropriate mood and affect, normal speech and motor activity, normal thought content, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 555-56.)

On May 23, 2017, plaintiff saw Dr. David Tylicki regarding her fibromyalgia and right leg/foot pain. She had been on gabapentin until it stopped working, had tried Cymbalta without benefit, and had never been on Lyrica. (Tr. at 429.) On exam, Dr. Tylicki noted 13/18 tender points (Tr. at 433), positive straight leg raise on the right, 5/5 strength, intact sensation, and no dynamic weakness with ambulation. He referred her for a sleep consult and prescribed Lyrica and a physical therapy/lumbar spine stabilization program. (Tr. at 434.)

On May 25, 2017, plaintiff told Tauer that she continued to struggle with family issues, life stressors, and an increase of negative thinking. She indicated that the pain management provider she had seen said he did not believe in fibromyalgia and that exercise was the answer; she felt invalidated. (Tr. at 751.) On June 1, plaintiff reported an increase in out of control

3

anxiety, continuing to limit life participation, an increase in crying spells, and continuing to be hypercritical of herself. She reported being so anxious the previous day she had to cancel her cat's vet appointment. (Tr. at 749.)

In June 6, 2017, plaintiff was seen for a diabetes evaluation. Originally diagnosed in 1994, she had been hospitalized in past, last in 2001. (Tr. at 474.) Her medications were continued. (Tr. at 478.)

On June 8, 2017, Tauer noted the same problem symptoms: increase in out of control anxiety, continues to limit life participation, and continues to be hypercritical of herself. Plaintiff was struggling with emotional response homework. (Tr. at 747.)

On June 8, 2017, plaintiff told Kosicek she did very well until the third week after her monthly injection, then become tearful and anxious again. (Tr. at 537.) Kosicek's mental status exam revealed plaintiff to be clean, friendly, cooperative, and alert, with appropriate mood and affect, normal speech and motor activity, normal thought content, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 544-45.)

On June 16, 2017, plaintiff underwent an eye exam, which revealed signs of mild diabetic retinopathy. (Tr. at 445.)

On June 16, 2017, Tauer again listed the same problem symptoms. (Tr. at 745.) Plaintiff felt that living in an apartment with her parents was stifling. (Tr. at 746.)

On July 11, 2017, plaintiff saw Dr. Carly Skamra for a fibromyalgia evaluation. Dr. Tylicki had recommended physical therapy. Plaintiff indicated that she had tried Lyrica, Cymbalta, and gabapentin, all of which worked at first then stopped. She reported severe fatigue, mental fogging, and concomitant depression. (Tr. at 584.) On exam, she displayed normal strength but 18/18 tender points. Dr. Skamra indicated that plaintiff needed a comprehensive pain management program. (Tr. at 585.)

On July 13, 2017, plaintiff told Kosicek her anxiety had increased; she was unsure if the anxiety related to chronic fibromyalgia pain. She was trying to find a pain management doctor. (Tr. at 526.) Mental status exam again revealed her to be clean, friendly, cooperative, and alert, with appropriate mood and affect, normal speech and motor activity, normal thought content, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 533-34.)

On July 25, 2017, plaintiff saw Dr. Bremberger, indicating she did not feel Dr. Tylicki was helpful. (Tr. at 480.) For her bipolar disorder, she was on injectable Abilify. (Tr. at 481.) She requested completion of forms to excuse her from federal student loans due to disability. Dr. Bremberger stated: "I request she follow up with the SSA or we can try to refer her for an occupational exam to determine disability status. I am not comfortable signing this form and discussed this with her today." (Tr. at 487.)

On August 3, 2017, Tauer recorded the same problem symptoms. Plaintiff indicted that she had taken a trip to Minnesota, which was tiring, but she felt reconnected with her friends. (Tr. at 743.) They discussed ways of connecting with people in Wisconsin. Plaintiff was also in the process of revising medications with Kosicek, as she felt manic again. (Tr. at 744.)

On August 10, 2017, plaintiff told Tauer that she felt clear headed and creative. (Tr. at 741.) She had been house sitting, caring for a dog, and working three days per week. She had been able to manage this with success and little anxiety. (Tr. at 742.) Plaintiff also saw Kosicek that day, reporting: "I'm doing really well." (Tr. at 515.) Kosocek's mental status exam

4

recorded the same positive findings (e.g., cooperative, intact concentration and judgment, good insight, unimpaired memory, and good attention span) as the previous visit. (Tr. at 522-23.)

On August 15, 2017, plaintiff saw Dr. Yechiel Kleen for evaluation of her generalized pain. Plaintiff reported constant pain all over her body, affecting her sleep pattern. (Tr. at 978.) On exam, strength was 5/5 in all four extremities, light touch intact, and straight leg raising 40 degrees bilaterally in the sitting position, most likely due to body habitus. Her gait was essentially within normal limits, and she was able to stand on heels and toes although it was difficult. Dr. Kleen noted plaintiff was morbidly obese but with no muscle atrophy in the upper or lower extremities. He assessed chronic pain syndrome involving essentially all her body, fibromyalgia, physical de-conditioning secondary to these conditions, sleep difficulties, and morbid obesity. He referred her for hydro therapy and to a pain psychologist. (Tr. at 979, 2114.)

On August 24, 2017, plaintiff started aquatic therapy. (Tr. at 989.) She described pain from the top of her head to the tips of her toes, as well as fibro fog, exhaustion, and anxiety. She tolerated standing for 15 minutes, walking for 15 minutes, and sitting for 60 minutes. (Tr. at 990.) She was then working one day per week, substituting at other times. (Tr. at 991.) She ambulated without an assistive device, with wide base of support and an antalgic gait pattern. (Tr. at 992.) She was scheduled for 12 visits (Tr. at 995), with the notes indicating she tolerated therapy well, felt she was getting better (Tr. at 1005, 1014, 1021, 1034, 1045), with improved endurance for walking, standing and completing daily tasks, and decrease in overall pain rating (Tr. at 1047). On October 5, it was recommended she continue with independent strengthening in the pool two to three days per week. (Tr. at 1048.)

On August 31, 2017, plaintiff was seen for iron deficiency, following her 2003 gastric bypass. (Tr. at 450.) She had been able to lose 180 pounds after the surgery, but her weight had plateaued and she remained overweight. (Tr. at 452.)

On September 11, 2017, Dr. Schenck completed a medical source statement, indicating that plaintiff was unable to work due to her mental impairments: PTSD, bipolar, and generalized anxiety disorder. He stated that she experienced unpredictable shifts in mood and anxiety, and great variability in her ability to interact with other people. (Tr. at 595.)

On September 22, 2017, plaintiff returned to Tauer, looking disheveled and with poor eye contact. (Tr. at 739.) She reported feeling very sad over the past two weeks but not able to identify a trigger. Home and work issues remained the same. She was doing hydrotherapy, feeling very good after. (Tr. at 740.) On September 29, Tauer and plaintiff explored the possibility that her sadness was a normal response to missing friends in Minnesota v. "new" symptoms of mental illness. (Tr. at 738.) On October 6, plaintiff reported a reduction in feeling manic. (Tr. at 735-36.) She continued to do water therapy, scheduled to meet with her pain doctor for further authorization. She reported feeling less pain, able to walk farther. (Tr. at 736.)

On October 12, 2017, plaintiff told Kosicek her depression was not as bad, but "Something is just off." (Tr. at 505.) Her response to medications was good but not great. (Tr. at 505.) On mental status exam, she appeared clean, friendly, cooperative, and alert, with appropriate affect, normal speech and motor activity, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 512-13.)

On October 16, 2017, plaintiff saw Dr. Kleen for follow up of generalized pain. She had finished her water therapy sessions, and it helped that she saw she could do more than she

5

thought, but she did not feel it helped her pain. She would be joining the YMCA and doing exercises there. She had not yet seen the pain psychologist. (Tr. at 1054.)

On November 3, 2017, plaintiff told Tauer she felt more level after a recent medication change. She was worried about an upcoming move. (Tr. at 734.)

On November 28, 2017, plaintiff saw Dr. Bremberger for rash, cough, and headache. She also asked Dr. Bremberger to complete a disability form. Dr. Bremberger stated: "I am unable to ethically complete her form today as she is currently working. I directed her to occupational health and/or the Social Security Administration if she is looking to obtain disability qualifications and/or work restrictions." (Tr. at 1317.) Dr. Bremberger further stated: "She is requesting that I complete a form stating that she is an able-bodied individual without dependents that can't work. She is working 3 hours per week right now. The county is requesting the form for a work exemption program." (Tr. at 1318.)

On December 12, 2017, plaintiff told Kosicek "that things are going really well. She is loving the injections and is so thankful for them." (Tr. at 617.) Mental status exam again revealed her to be clean, friendly, cooperative, and alert, with appropriate mood and affect, normal speech and motor activity, normal thought content, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 624-25.)

On January 9, 2018, plaintiff returned to Dr. Bremberger, noting her rash had improved but never went entirely away. (Tr. at 2256.) Dr. Bremberger noted a BMI of 53.16. Plaintiff appeared alert and oriented x3, with normal mood, affect, and behavior. (Tr. at 2257.)

On January 12, 2018, Tauer noted the same problem symptom list as previously. (Tr. at 731.) Plaintiff reported she had been depressed for the last six weeks and asked about an increase in medication. Plaintiff also noted her car had been repossessed, resulting in lost independence and inability to visit friends. Tauer noted this would make anyone feel blue. (Tr. at 732.)

On January 13, 2018, plaintiff saw Dr. Bremberger for follow up. (Tr. at 1364.) The rash improved but never went away. (Tr. at 1365.) Plaintiff displayed normal mood, affect, and behavior. (Tr. at 1366.) On January 16, plaintiff saw Amy Galati, DPM (podiatrist), for painful elongated nails. (Tr. at 2281.)

On February 1, 2018, plaintiff told Tauer she was worried that her depression had returned; current stressors included financial issues, increased pain from fibromyalgia, and her parents' poor health. (Tr. at 729-30.) She reported that prior to these recent stressors she felt the best she had in a long time. Her fibromyalgia pain was higher, and her insurance had stopped authorizing the water therapy she was doing. (Tr. at 730.)

On February 5, 2018, plaintiff saw Dr. Bremberger for cellulitis, medication management, and diabetes. (Tr. at 1397.) On February 9, Dr. Bremberger noted diagnoses of type 2 diabetes with retinopathy, chronic, stable; fibromyalgia, chronic, stable; chronic pain syndrome, chronic, stable; peripheral polyneuropathy, chronic, stable; and physical de-conditioning, chronic, stable. At that time, Dr. Bremberger agreed to complete a form medical statement for plaintiff's disability claim, stating: "Forms completed with patient today to the best of my ability per her request and sent for scanning." (Tr. at 1419.) "Here with request to review and complete form regarding work capacity in setting of her chronic medical conditions. She will also be having similar forms completed with her psychiatrist for her chronic mental conditions. We went through the forms together today based on her recent visits and chronic medical problems." (Tr. at 1420.)

6

In the February 9, 2018, diabetes medical source statement, Dr. Bremberger listed diagnoses of fibromyalgia, chronic pain syndrome, peripheral neuropathy, physical de-conditioning, and type 2 diabetes with retinopathy and long-term use of insulin. (Tr. at 597.) Dr. Bremberger check boxes indicating plaintiff would be off task 25% of the day, work at less than 50% efficiency, could sit and stand/walk less than two hours in eight-hour workday (lying down during the remainder due to fatigue), needed four unscheduled breaks per day, could occasionally lift 10 pounds, occasionally use her hands and fingers, and would have more than four absences per month. (Tr. at 598-99.) On the same date, Dr. Bremberger completed a lower extremity edema form, indicating plaintiff needed to elevate her legs at least two hours during an eight hour daytime period. (Tr. at 600.)

On February 13, 2018, plaintiff told Kosicek she quit her job in January. "I just don't have any energy to do anything." (Tr. at 605.) Kosicek's mental status exam revealed plaintiff to be clean, friendly, cooperative, and alert, with appropriate mood and affect, normal speech and motor activity, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 613-14.)

On February 19, 2018, plaintiff was seen at Forefront Dermatology for a rash. (Tr. at 2189.) She was given hydrocortisone ointment. (Tr. at 2191.)

On February 20, 2018, Tauer noted the same problem symptoms. (Tr. at 727.) Plaintiff had not been taking Effexor. (Tr. at 727-28.)

On February 20, 2018, Kosicek completed a mental impairment medical source statement. She indicated that plaintiff experienced severe fatigue, needing to lie down three or more hours during the workday (Tr. at 589); would have difficulty relating appropriately to others several times a week or more often; would miss more than four days of work per month and would be unable to leave home independently more than four days per month; would need unscheduled breaks two to three times during the workday (Tr. at 590); would be off task more than 30% of the time and work at less than 50% efficiency; and would need redirection one to two times per day. (Tr. at 591.) Kosicek also endorsed marked limitations in the four paragraph B areas and indicated plaintiff had minimal ability to adapt to changes. (Tr. at 592-93.)

Tauer also completed a mental impairment medical source statement on February 20, 2018. She opined that plaintiff experienced severe fatigue, needing to lie down three or more hours during the workday (Tr. at 714); would have difficulty relating appropriately to others several times a week or more often; would miss more than four days of work per month and be unable to leave home independently more than four days per month; would need unscheduled breaks two to three times per workday (Tr. at 715); would be off task more than 30% of the time and work at less than 50% efficiencyl and would need an unusual level of supervision three-plus times per day. (Tr. at 716.) Tauer also endorsed marked limitations in the four paragraph B areas, with minimal ability to adapt to changes. (Tr. at 717-18.)

On February 21, 2018, plaintiff saw Dr. Shubhi Sehgal for evaluation of type 2 diabetes at the request of Dr. Bremberger. (Tr. at 2065.) She reported numbness and tingling in the feet. (Tr. at 2066.) Dr. Sehgal noted mild non-proliferative retinopathy without macular edema and diabetic neuropathy with stable symptoms. (Tr. at 2070.) He continued her medications, with a return in three months. (Tr. at 2071.)

On March 2, 2018, therapist Johnson completed a medical source statement. Johnson indicated she started seeing plaintiff on 4/8/08 for bipolar disorder, PTSD, and anxiety disorder.

7

Johnson indicated that plaintiff experienced at least episodic severe fatigue and would need to lie down three or more hours in a typical eight-hour daytime period (Tr. at 916); would have difficulty interacting with or working in proximity to others several times a week or more (Tr. at 916, 918); would likely miss more than four days of work per month due to the need for treatment or bad days with symptoms (Tr. at 918); would be unable to independently leave her residence more than four days per month (Tr. at 918); would need unscheduled breaks of at least fifteen minutes several times per day (Tr. at 918); would be off task more than 30% of the time and perform at less than 50% efficiency (Tr. at 919); would be unable to start or complete tasks without an unusual level of supervision one to two times a day (Tr. at 919); exhibited a pain or somatic symptom disorder and when symptoms flared would have difficulty coping with any situation (Tr. at 919); experienced a marked impairment in each of the four paragraph B criteria (Tr. at 920-21); and her mental disorders resulted in marginal adjustment, meaning she had minimal capacity to adapt to changes (Tr. at 921).

On March 5, 2018, Dr. Schenck completed a mental impairment medical source statement, listing diagnoses of bipolar 2 disorder, prolonged PTSD, generalized anxiety disorder, and insomnia. (Tr. at 2056.) Dr. Schenck opined that plaintiff suffered from episodic severe fatigue due to depressed mood, and would likely need to lie down two hours during a typical eight-hour daytime period, variable depending on the level of depression (Tr. at 2056); would likely have difficulty interacting or working in proximity to others, with trouble responding appropriately to criticism from supervisors; would likely miss more than four days per month due to the negative interaction of bipolar and PTSD symptoms; would be unable to travel independently more than four days per month due to the negative interaction of PTSD, bipolar and anxiety symptoms; would need unscheduled breaks two to three times per day due to powerful negative interactions of PTSD, generalized anxiety, and bipolar symptoms (Tr. at 2057); would be off task 25% of the workday and work at less than 50% efficiency; and would be unable to complete even simple work tasks without an unusual level of supervision several times per week (Tr. at 2057). He indicated this was a "best guess" answer given her level of major psychiatric disorders and their negative interactions. (Tr. at 2058.) He found marked limitations in interacting with others; concentrating, persisting, and maintaining pace; and adapting or managing oneself; but not in understanding, remembering and applying information. (Tr. at 2059-60.)

On March 23, 2018, plaintiff returned to Forefront Dermatology, her rash 60% improved. (Tr. at 2192.)

On March 27, 2018, Tauer noted plaintiff's reports of an increase in out of control anxiety regarding everyday tasks, catastrophic thinking, and inability to stop ruminating thoughts. She continued to limit life participation, sleeping and hiding in her bedroom more, with an increase in crying spells. (Tr. at 2219.)

On April 10, 2018, plaintiff told Kosicek, "I am sleeping 6 hours and feeling tired during the day. I am drinking two cups of coffee per day. Last coffee drink is around 1 pm. I am attending therapy and it helps me care for myself and set life goals. I am having hallucinations like going over rail road and train hitting me. I am always worried about something." (Tr. at 1821-22.) She needed medication refills and her injection. Kosicek noted her response to medications was positive but could be better. (Tr. at 1822.) On mental status exam, she appeared clean and well-groomed, with a steady gait; her attitude was friendly and cooperative; her level of awareness alert; eye contact good; mood appropriate; affect appropriate; motor

8

activity normal; gait steady; oriented x4; psychomotor activity normal; speech normal; thought process logical, relevant, and able to follow commands and recall a time-line of events; thought flow and content normal; concentration intact and adequate; judgment intact; insight good; memory not impaired; and attention span good. (Tr. at 2342-43.)

On April 10, 2018, Tauer noted the same problem symptoms as on previous notes (increase in out of control anxiety, continues to limit life participation, and continues to be hypercritical of herself). (Tr. at 2221.) Tauer also noted plaintiff's mental status: thought process logical and coherent, mood anxious, fully oriented, and attitude cooperative. (Tr. at 2221.) Plaintiff reported she had a panic attack last week and could not leave her apartment for two days. (Tr. at 2221-22.) She also reported increased pain, using Tylenol. (Tr. at 2222.)

On May 29, 2018, Tauer noted the same problem symptom list. Mental status was the same as the previous visit: thought process logical and coherent, mood anxious, fully oriented, and attitude cooperative. (Tr. at 2223.) Plaintiff reported her disability claim was again denied, and she was frustrated. (Tr. at 2223-24.) She spent three days in bed as a result of that decision. Kosicek had added a medication, and plaintiff felt less depressed but it made her hungry. She reported struggling with reading or completing complex tasks as she felt she got lost in the language or frustrated she did not understand the story line. (Tr. at 2224.)

On June 12, 2018, Tauer noted the same mental status (logical and coherent thought process, anxious mood, fully oriented, and cooperative attitude). (Tr. at 2225.) Plaintiff came to the session tearful and shaking, concerned about her father's failing health. She had weaned herself off Klonapin as it made her more agitated, and she had gained 18 pounds. She was to meet with Kosicek that day to discuss medications. (Tr. at 2226.)

On June 12, 2018, plaintiff told Kosicek her symptoms had increased in severity. (Tr. at 1823.) Kosicek made several notations—prognosis: regressing, functional status: fair, stable; and impression: engaged. She needed a change in medication. "I had a lot of mood swings lately. I feel flat. I've felt this way for about a month or two." "Sleep is good on the medication." (Tr. at 1824.) Mental status exam revealed a clean appearance, well-groomed; friendly, cooperative attitude; alert level of awareness; good eye contact; appropriate mood and affect; normal motor activity normal; steady gait; oriented x4; normal psychomotor activity and speech; thought process logical, relevant, and able to follow commands and recall a time-line of events; thought flow and content normal; concentration intact, adequate; judgment intact; insight good; memory not impaired; and attention span good. (Tr. at 2333-34.)

On June 26, 2018, Tauer noted the same mental status (logical and coherent thought process, anxious mood, fully oriented, and cooperative attitude). (Tr. at 2227.) Plaintiff reported she met with Kosicek and her medications were adjusted. (Tr. at 2227-28.) She had gotten her car back and was helping her mom more. (Tr. at 2228.)

On July 6, 2018, plaintiff saw Dr. Sehgal. (Tr. at 2073.) He noted normal range of motion of all joints (Tr. at 2076) and continued medications (Tr. at 2077).

On July 23, 2018, plaintiff told Kosicek her symptoms had increased in severity. (Tr. at 1825.) Kosicek noted plaintiff's functional status as fair, stable, indicating she was doing better since titrated off Klonopin. "Not working yet. Home full time.' (Tr. at 1826.) On mental status exam, plaintiff appeared clean and well-groomed, with a friendly, cooperative attitude; alert level of awareness; good eye contact; appropriate mood and affect; normal motor activity; steady gait; oriented x4; normal psychomotor activity and speech; logical and relevant thought process, able to follow commands and recall a time-line of events; normal thought flow and

content; intact and adequate concentration; intact judgment; good insight; unimpaired memory; and good attention span. (Tr. at 2318-19.)

On August 2, 2018, Tauer noted the same mental status: logical and coherent thought process, anxious mood, fully oriented, and cooperative attitude. (Tr. at 2229.) Plaintiff came into the session tearful, with flat affect and rigid body posture. (Tr. at 2229.) She was frustrated with not feeling better, medication changes not helping. She felt like she had no purpose in her life. (Tr. at 2230.)

On August 16, 2018, Tauer noted the same mental status. (Tr. at 2499.) Plaintiff came into the session tearful, shaking, and reporting that she was feeling very down and depressed. (Tr, at 2499-500.) She was sleeping more, feeling overwhelmed, with increased racing thoughts. She had a panic attack looking at job ads. She had gained 70 pounds with medication changes, feeling very physically restricted. (Tr. at 2500.)

On August 28, 2018, Kosicek noted plaintiff appeared to be regressing. (Tr. at 1827-28.) Plaintiff stated: "I really have been so depressed again. I'm disengaged from life . . . just not doing well. I'm having issues going to sleep and staying asleep. During the day I'm very anxious. I know I need my meds adjusted, that's why I'm here." (Tr. at 1828.) Kosicek's mental status exam nevertheless contained "good," "appropriate," "normal," and "intact" findings, as previously. (Tr. at 1960-61.)

On August 30, 2018, Tauer again noted logical and coherent thought process, anxious mood, fully oriented, and cooperative attitude. (Tr. at 2501.) Plaintiff reported being frustrated with Kosicek, as her current medications continued to increase her weight, and she continued to feel increased depression, sleeping 14-16 hours. She was looking forward to rejoining a church group. She also reported increased fibromyalgia pain with all of the weather changes. (Tr. at 2502.)

On September 4, 2018, plaintiff told Kosicek: "I just can't seem to get rid of my depression and anxiety." (Tr. at 1937-38.) She got depressed because she was not doing anything but got really anxious when she tried to do anything. (Tr. at 1938.) Kosicek's mental status exam again revealed clean and well-groomed appearance, friendly and cooperative attitude, good eye contact, appropriate mood and affect, normal motor activity and speech, logical thought process, ability to follow commands and recall a time-line of events, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 1946-47.)

On September 11, 2018, plaintiff returned to podiatrist Galati regarding painful elongated nails in both feet, causing pain with walking, and requesting a diabetic foot exam. She reported ongoing lower extremity edema. (Tr. at 2078.) On exam, Dr. Galati noted edema in the bilateral lower legs and some decreased sensation, but 5/5 muscle strength bilaterally, symmetrical muscle mass, and full range of motion. (Tr. at 2082.)

On September 20, 2018, plaintiff told Kosicek: "I've just been so down that it is challenging to concentrate and I knew that if I came in, you could help me." (Tr. at 1820.) Kosicek reviewed medications with plaintiff, including when to take them. (Tr. at 1820.) Mental status exam again revealed clean and well-groomed appearance, friendly and cooperative attitude, good eye contact, appropriate mood and affect, normal motor activity normal and speech, logical thought process, ability to follow commands and recall a time-line of events, intact concentration and judgment, good insight, unimpaired memory, and good attention span. (Tr. at 2360-61.)

10

On September 25, 2018, plaintiff told Kosicek her symptoms had decreased in severity. (Tr. at 1924.) She noticed a little bit of difference with the new medication, still feeling "blah" with no energy, but it was better. She reported no manic symptoms. (Tr. at 1925.) Mental status exam was essentially the same as the previous visit. (Tr. at 1933-34.)

On October 5, 2018, plaintiff saw Dr. Bremberger for a routine exam and cough, nausea. (Tr. at 1981.) Her BMI was 55.53, and her general appearance alert, cooperative, and well groomed. (Tr. at 1986.) Dr. Bremberger noted normal mood and appropriate affect. (Tr. at 1987.) She further noted mild persistent asthma. (Tr. at 1988.)

On October 11, 2018, Tauer noted the same mental status findings as previous visits: logical and coherent thought process, anxious mood, fully oriented, and cooperative attitude. (Tr. at 2503.) In the narrative section of the note, Tauer indicated that plaintiff came to the session with very flat affect, poor eye contact, and spoke softly. (Tr. at 2503-04.) She felt hopeless and helpless at times, and she struggled to complex tasks. (Tr. at 2504.)

On October 23, 2018, plaintiff provided a mixed report to Kosicek. (Tr. at 1916.) "Things are pretty good. I just feel real depressed now. No periods of mania, just depressed most days." Her anxiety had improved with medications. She needed to find a new counselor, as Tauer was leaving. (Tr. at 1917.) Kosicek's mental status exam was also mixed, noting a disheveled appearance, guarded attitude, fluctuating level of awareness, limited eye contact, depressed mood with congruent affect, hyperactive motor activity, psychomotor activity retardation, slow/hesitant speech, fluctuating concentration, poor judgment and insight, and impaired memory, but with logical thought process, the ability to follow commands and recall a time-line of events, no suicidal intent, and fair attention span. (Tr. at 1920-21.)

On October 25, 2018, Tauer noted the same mental status as at her previous sessions with plaintiff: thought process logical and coherent, mood anxious, fully oriented, and attitude cooperative. (Tr. at 2505.) Plaintiff had started on a new medication for resistant depression and chronic pain. (Tr. at 2505-06.) She reported difficulty sleeping at night, anhedonia, low energy, and feeling like she was in a fog. (Tr. at 2506.) Tauer noted that she was leaving the practice, and plaintiff was going to see a provider closer to her home. Tauer noted that plaintiff had partially met the goals of treatment, starting some new self-care practices and increasing her activities outside home, but she continued to struggle with the intensity of her depression. (Tr. at 2507.) Plaintiff thereafter started counseling sessions with Debbie Wicker, but as indicated above Wicker produced no notes from their sessions.

On November 13, 2018, plaintiff told Kosicek: "Maybe I'm slightly better, but again, not much." (Tr. at 1908.) She reported that daily life was a chore and sleep a challenge as well. "Overall, I'm really trying, but the depression is insurmountable." (Tr. at 1908.) Kosicek concluded that she needed a change of medication. (Tr. at 1910.) Mental status exam at that time revealed some abnormalities, including disheveled appearance, depressed mood, variable eye contact, slow/hesitant speech, and impaired concentration and judgment. However, plaintiff also presented as friendly, alert, and fully oriented, with logical and relevant thought process, no absent suicidal intent, unimpaired memory, and fair attention span. (Tr. at 1912-13.)

On December 11, 2018, plaintiff described her mood to Kosicek as "flat-lined." She reported fatigue and lack of interest, but denied irritability and mood swings. (Tr. at 1901.) Kosicek reported her functional status as poor, stable. (Tr. at 1903.) On mental status exam, plaintiff presented with a depressed mood and limited judgment, but a clean appearance,

11

friendly and cooperative attitude, good eye contact, normal motor activity, logical and organized thought process, the ability to follow commands and recall a time-line, normal thought content, intact concentration, fair insight, unimpaired memory, and good attention span. (Tr. at 1904-06.)

On December 14, 2018, plaintiff saw Dr. Sehgal for follow up of her diabetes, with an A1c of 8.0, up from 7.5 on February 21, 2018. She was inconsistently taking medications. (Tr. at 2083.) Plaintiff reported numbness and tingling her feet. (Tr. at 2084.) On exam, Dr. Sehgal noted no focal motor or sensory deficit and normal range of motion of all joints. Medications were continued. (Tr. at 2086.)

On January 3, 2019, plaintiff told Kosicek: "I'm so flat. I don't want to live. I don't have a pain doctor right now. They had me on Cymbalta and it did not work. Neurontin was horrible for me. Nothing works. I'm in bed all day just laying there from the pain. The pain is contributing to the depression. I have zero desire, hope, positive anything. I'm just surviving. I'm not suicidal." (Tr. at 1894.) Kosicek noted plaintiff appeared to be regressing, with poor functional status and in need of a change of medication. (Tr. at 1896.) She highly encouraged plaintiff to seek inpatient status. (Tr. at 1897.) Kosicek's mental status exam contained mixed findings: disheveled appearance, cooperative attitude, alert level of awareness, good eye contact, depressed mood, normal motor activity, full orientation, slow/hesitant speech, logical thought process, ability to follow commands and recall a time-line, normal thought flow and thought content, intact concentration, limited judgment, fair insight, unimpaired memory, and good attention span. (Tr. at 1898-99.) Kosicek started plaintiff on lithium, continuing other medications. (Tr. at 1900.)

On January 14, 2019, Debbie Wicker prepared a mental impairment medical source statement. Wicker opined that plaintiff exhibited severe fatigue due to depressed mood and would likely need to lie down three or more hours during a typical eight-hour daytime period. (Tr. at 2512.) Wicker wrote "N/A unemployed" in response to the questions on the form about relating appropriately to others in a workplace, missed work due to symptoms or treatment, and need for unscheduled breaks. (Tr. at 1512-13.) However, she then opined plaintiff would be off task more than 30% of typical workday, would work at less than 50% efficiency, and could not perform detailed work tasks. (Tr. at 2513.) She further opined that plaintiff would require an unusual level of supervision several (three-plus) times per day ("hard to stay on task because of anxiety and concentration issues"). She also endorsed pain and other somatic complaints, noting plaintiff had been diagnosed with severe fibromyalgia. (Tr. at 2514.) Finally, she endorsed marked impairment in all four areas of the paragraph B criteria (Tr. at 2514-15), with marginal adjustment ("anxiety and depressed mood limit all ability to adapt to even small changes in environment") (Tr. at 2516).

On January 16, 2019, plaintiff told Kosicek that "she feels better. Affect is better, feels like she can think on her own now, and not as depressed. Still not near functioning on a daily basis, but has noted feeling better since last visit." (Tr. at 1887.) Kosicek noted an improved prognosis and good functional status. (Tr. at 1889.) Mental status exam noted a depressed mood but clean appearance, friendly and cooperative attitude, good eye contact, normal speech and psychomotor activity, logical thought process, ability to follow commands and recall a time-line, normal thought content, intact concentration and judgment, fair insight, and good attention span good. (Tr. at 1890-92.)

On February 11, 2019, plaintiff told Kosicek: "My depression is mainly around not having

12

a purpose. I live at home and watch my parents watch TV. It is depressing." (Tr. at 1880.) Kosicek noted a slightly improving prognosis but not clinically significant, and a fair, stable functional status. (Tr. at 1882.) Kosicek's mental status exam again contained mixed findings with disheveled appearance, cooperative attitude, good eye contact, depressed mood, full orientation, normal psychomotor activity and speech normal, logical thought process, normal thought flow and thought content, intact concentration, limited judgment, fair insight, unimpaired memory, and fair attention span. (Tr. at 1884-85.)

On February 13, 2019, plaintiff saw Dr. Andrew Vo, an orthopedist, for low back pain. (Tr. at 2107.) On exam, Dr. Vo noted no edema, normal strength and reflexes, and normal coordination and gait. He further noted normal mood, affect, speech, behavior, cognition, and memory. (Tr. at 2108.) He recommended physical therapy and ordered a lumbar MRI. (Tr. at 2109.)

On April 16, 2019, plaintiff saw Dr. Sehgal for diabetes follow up. (Tr. at 2087-88.) Her A1c was 7.9. She again reported numbness and tingling in the feet. (Tr. at 2088.) Neurologic exam found no focal motor or sensory deficit, and musculoskeletal exam revealed normal range of motion of all joints. (Tr. at 2089.)

On May 21, 2019, plaintiff saw Anton Sella, DPM (podiatrist), for a foot exam. (Tr. at 2091.) Dr. Sella noted some decreased sensation but 5/5 muscle strength bilaterally, symmetrical muscle mass, and full range of motion. (Tr. at 2095.) He advised plaintiff to wear good supportive shoes and emphasized the importance of blood sugar control. (Tr. at 2095.)

On June 17, 2019, plaintiff told Kosicek the medications were working well, except she was only sleeping five or six hours per night. She did note some improvement in mood since the last visit. (Tr. at 1876.) On mental status exam, she appeared disheveled and depressed, but with direct eye contact, normal speech, appropriate attitude, intact attention span and concentration, orientation within normal limits, intact memory, judgment within normal limits, insight within normal limits, intact abstract reasoning, able to complete simple computations, and relevant thought content. (Tr. at 1877.)

On August 19, 2019, plaintiff told Kosicek she felt "flat." (Tr. at 1873.) She wanted to stop one of her medications. She took Tylenol for fibromyalgia, indicating no other medications helped. She reported mood swings, pain, and anxiety. (Tr. at 1873.) Mental status exam was similar to the last visit, with depressed mood and disheveled appearance, but direct eye contact, normal speech, coherent language, appropriate attitude, intact attention span and concentration, orientation within normal limits, intact memory and judgment, good insight, and relevant thought content. (Tr. at 1874.) Kosicek discontinued one medication. (Tr. at 1874.)

On September 16, 2019, plaintiff saw Dr. Sehgal for diabetes follow up. Her A1c was 8.1, and she reported numbness and tingling in her feet. (Tr. at 2096.) Neurologic and musculoskeletal exams were again largely normal. (Tr. at 2097.) Dr. Sehgal noted uncontrolled type 2 diabetes with hyperglycemia, increasing medications. (Tr. at 2098.)

On October 14, 2019, plaintiff saw Kosicek, indicating she was happy with the medication change. "She felt much less flat with the [new medications] over the part 2 months. She is not feeling depressed and hasn't been feeling too moody, but knows it can change any day, so she is very good about taking her medications daily." (Tr. at 1870.) Mental status exam at that time revealed disheveled appearance, direct eye contact, normal speech, coherent language, appropriate attitude, intact attention span and concentration, orientation within normal limits, intact memory, depressed mood, flat affect, intact judgment, good insight,

13

intact abstract reasoning, ability to complete simple computations, and relevant thought content.  (Tr. at 1870-71.)

On October 19, 2019, Wicker prepared a letter about plaintiff's condition, indicating they had been meeting weekly for the past year.  Wicker stated that plaintiff was severely emotionally impaired, likely as the result of abuse she suffered as a child.  As a result of the abuse, plaintiff felt the need for protection in all situations.  If a place is welcoming and she feels comfortable with the people, she is able to function.  But in any new, unfriendly, or unfamiliar circumstance, she has severe and debilitating panic attacks.  When she tried to work by herself, without her family present, she was terrorized and totally unable to function.  This had been occurring since she was 16 years old.  Wicker indicated that someone from plaintiff's family must accompany her everywhere she goes until she feels comfortable.  She spent the majority of her life at home with her parents and almost never went anywhere without them.  She was only willing to meet with Wicker because her mother contacted Wicker and brought her in for the first few sessions.  Wicker tried to get plaintiff to meet at a coffee shop, rather than a private room at the library, to help address her avoidance issues, but plaintiff was completely terrorized by the thought of changing locations.  Wicker concluded: "Dana's symptoms are consistent with a diagnosis of personality disorder characterized by avoidance.  Until Dana is able to overcome her need for 'protection' she will not be able to work."  (Tr. at 1869.)

14